# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HON. THOMAS MASSIE, in his individual and official capacities; HON. MARJORIE TAYLOR GREENE, in her individual and official capacities; HON. RALPH NORMAN, in his individual and official capacities, | CASE NO. 1:21-CV- 02023-RBW |
| Plaintiffs, | |
| v. | |
| HON. NANCY PELOSI, in her official capacity; WILLIAM J. WALKER, in his official capacity; CATHERINE SZPINDOR, in her official capacity, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – ORAL ARGUMENT REQUESTED[1]

Christopher Wiest (DCD KY002)
Chris Wiest, Attorney at Law, PLLC
25 Town Center Blvd, Ste. 104
Crestview Hills, KY 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

Aaron Siri (*pro hac vice*)
Elizabeth A. Brehm (*pro hac vice*)
Jessica Wallace (*pro hac vice*)
SIRI & GLIMSTAD LLP
200 Park Avenue, 17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com

John R. Garza
Bar ID: 398728
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
Tel: (301) 340-8200 x 100
jgarza@garzanet.com

Thomas Bruns (*pro hac vice*)
Bruns, Connell, Vollmar, Armstrong LLC
4750 Ashwood Drive, Ste. 200
Cincinnati, Ohio 45241
Tel: (513) 312-9890
tbruns@bcvalaw.com

*Counsel for Plaintiff*s

---

[1] Because this matter involves a case largely of first impression and involves paramount issues of Congressional Member independence well outside the factual context in which the case arises, Plaintiffs respectfully request that oral argument be ordered in this matter.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

INTRODUCTION .................................................................................................. 1

STANDARD OF REVIEW .................................................................................... 3

ARGUMENT ......................................................................................................... 3

   I    The Court Has Jurisdiction To Provide Relief Against the Unconstitutional Conduct By Employees of the House of Representatives. ........................................................... 3

     A.    Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review. ........................................ 4

     B.    Enforcing a Mask Mandate & Administering Payroll Are Not Core Legislative Functions Covered By the Speech or Debate Clause ................................................. 7

     C.    To Prevent Illegal Conduct, House Employees Are Not Immune from Suit,  Even if the Members of Congress Who Authorized that Conduct Are Immune. .............................. 14

   II   Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted. .............................. 18

     A.    The Fines Levied Under the Rule Violate the Twenty-Seventh Amendment by Varying (Reducing) Members' Actual Compensation. ......................................................... 18

       1.    A primary purpose of the 27th Amendment is to prevent the reduction of Congressional salaries, a practice the Founders expressly recognized could be used to threaten the integrity and independence of Members, and dissuade individuals of modest means from serving in Congress. ....................................................................... 18

       2. H. Res. 38 is a "Law" that Varies Compensation in Violation of the 27th Amendment .................................................................................................................. 25

     B.    The Imposition of Fines for Behavior that is Not Disorderly is Beyond the Power of the House Under Article I, § 5. ............................................................................ 31

     C.    A claim is stated for a violation of Article I, §§ 6 and 7 ........................................... 35

     D.    A claim has been stated under the First Amendment ................................................ 36

       1.    Symbolic speech (going to the floor unmasked) .................................................... 36

       2.    Compelled speech (the requirement to be masked) ................................................ 42

       3.    Forum analysis ................................................................................................ 44

CONCLUSION .................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Am. Nat'l Ins. Co. v. FDIC,*
  642 F.3d 1137 (D.C. Cir. 2011) ................................................................................................ 3

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
  576 U.S. 787 (2015) .................................................................................................................. 27

*Arpaio v. Obama,*
  797 F.3d 11(D.C. Cir. 2015) ..................................................................................................... 3

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................................................... 3

*Atchinson v. District of Columbia,*
  73 F.3d 418 (D.C. Cir. 1996) .................................................................................................... 3

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) .............................................................................................. 44

*\* Barker v. Conroy,*
  921 F.3d 1118 (D.C. Cir. 2019) .................................................................................... 9, 11, 12

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................................................... 3

*Blau v. Fort Thomas Pub. Sch. Dist.,*
  401 F.3d 381(6th Cir. 2005) .................................................................................................... 40

*Boehner v. Anderson,*
  30 F.3d 156 (D.C. Cir. 1994) ....................................................................................... 6, 11, 26

*Bond v. Floyd,*
  385 U.S. 116 (1966) .................................................................................................................. 32

*Brown v. Louisiana,*
  383 U.S. 131 (1966) .................................................................................................................. 37

*Callins v. Collins,*
  510 U.S. 1141 (1994) ................................................................................................................ 25

*Capitol Square Review & Advisory Bd. v. Pinette,*
  515 U.S. 753 (1995) ............................................................................................................44-45

*Clinton v. City of New York*,
   524 U.S. 417 (1998).................................................................................... 36

*Christoffel v. United States*,
383 U.S. 84 (1989)…………………………………………………………………….........33

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
   356 F.3d 197 (2nd Cir. 2004)..................................................................... 40

*Cohen v. California*,
   403 U.S. 15 (1971).................................................................................... 37

*Columbia Broadcasting System, Inc. v. U.S.*,
   316 U.S. 407 (1942).................................................................................. 27

\* *Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.*
   515 F.2d 1341 (D.C. Cir. 1975) ......................................................... *passim*

*Davis v. Passman*,
   544 F.2d 865 (1977)................................................................................... 9

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).................................................................................. 25

*Doe v. McMillan*,
   412 U.S. 306 (1973)......................................................................... 7, 9, 16

*Dombrowski v.Eastland*,
   387 U.S. 82 (1967).............................................................................. 14, 15

*Engel v. Vitale*,
   370 U.S. 421(1962).................................................................................. 20

*Ex parte City Bank of New Orleans*,
   44 U.S. 292 (1844).................................................................................... 33

*Exxon Corp. v. FTC*,
   589 F.2d 582 (D.C. Cir. 1978).............................................................. 25, 33

*Fields v. Office of Johnson*,
   459 F.3d 1 (D.C. Cir. 2009)................................................................. 17, 18

*Food Employees v. Logan Valley Plaza, Inc.*,
   391 U.S. 308 (1968).................................................................................. 37

*Fulton v. City of Philadelphia,*
    141 S.Ct. 1868 (2021) .................................................................................. 24

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) ...................................................................................... 45

*Goldwater v. Carter,*
    617 F.2d 697 (D.C. Cir. 1979) ...................................................................... 6

* *Gravel v. U.S.,*
    408 U.S. 606 (1972) ............................................................................. *passim*

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ...................................................................................... 8

*Holloman ex rel. Holloman v. Hartland,*
    370 F.3d 1252 (11th Cir. 2004) ................................................................... 41

*Horne v. Dept. of Agric.,*
    576 U.S. 351 (2015) .................................................................................... 21

*Humphrey v. Baker,*
    848 F.2d 211 (D.D.C. 1988) ....................................................................... 36

* *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) ................................................................... 37, 39, 40, 41

*Johanns v. Livestock Marketing Ass'n,*
    544 U.S. 550 (2005) .................................................................................... 44

*Jones v. Horne,*
    634 F.3d 588 (D.C. Cir. 2011) ....................................................................... 3

*Jordan v. Hutcheson,*
    323 F. 2d 597 (4th Cir 1963) ...................................................................... 25

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.,*
    536 U.S. 88 (2002) ...................................................................................... 21

*Kaahumanu v. Hawaii,*
    682 F.3d 789 (9th Cir. 2012) ...................................................................... 40

*Kennedy v. Sampson,*
    511 F.2d 430 (D.C. Cir. 1974)……………………………………………….....6

\* *Kilbourn v. Thompson,*
   *103 U.S. 168 (1880)* ........................................................................... *passim*

*Kisor v. Wilkie,*
   139 S.Ct. 2400 (2019) ....................................................................... 21

*Law* v. *Siegel,*
   571 U.S. 415 (2014) ........................................................................... 27

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................. 3

*McCarthy v. Pelosi,*
   5 F.4ᵗʰ 34 (D.C. Cir. 2021) ......................................................... 7, 8, 16

*McGrain v. Daugherty,*
   273 U.S. 135 (1927) ........................................................................... 20

*Metzenbaum v FERC*
   675 F. 2d 1282 (D.C. Cir. 1982)……………………………………………..32, 33

*Michel v. Anderson,*
   817 F. Supp. 126 (D.D.C. 1993) ......................................................... 29

*Moore v. U.S. House of Rep.,*
   733 F.2d 946 (D.C. Cir. 1984) ............................................................. 6

*Neal v. Delaware,*
   103 U.S. 370 (1881) ........................................................................... 31

*NLRB v. Noel Canning,*
   573 U.S. 513 (2012), ...................................................................... 4, 29

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ........................................................................... 45

\* *Powell v. McCormack,*
   395 U.S. 486 (1969) ..................................................................... *passim*

*Pressler v. Simon,*
   428 F. Supp. 302 (D.C.D. 1976) ......................................................... 36

*Rangel v. Boehner,*
   785 F.3d 19 (D.C. Cir. 2015)……………………………………………………..7, 12, 13

*Rangel v. Boehner,*
  20 F. Supp. 3d 148 (D.C.D. 2013) ................................................................. 8, 32

*Ransom v. FIA Card Servs., N.A.,*
  562 U.S. 61 (2011) ............................................................................................ 32

*Riley v. Nat'l Federation of the Blind of North Carolina, Inc.,*
  487 U.S. 781 (1988) .......................................................................................... 44

*Rucho v. Common Cause,*
  139 S.Ct. 2484 (2019) ...................................................................................... 22

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ............................................................................................ 44

*Sch. Dist. of Abingon Twp. v. Schemp,*
  374 U.S. 203 (1963) .......................................................................................... 22

*Schacht v. United States,*
  398 U.S. 58 (1970) ............................................................................................ 37

*Schaffer v. Clinton,*
  240 F.3d 878 (10th Cir. 2001) ......................................................................... 24

*Scialabba v. Cuellar de Osorio,*
  573 U.S. 41 (2014) ............................................................................................ 27

*Singer v. U.S.,*
  380 U.S. 24 (1965) ............................................................................................ 22

\* *Spence v. Washington,*
  418 U.S. 405, 94 S. Ct. 2727 L. Ed. 2d 842 (1974) .............................. 38, 39, 40, 41

*Stockdale* v. *Hansard,*
  9 Ad. & E. 1, 112 Eng. Rep. 1112 (K. B. 1839) ............................................. 14

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
  309 F.3d 144 (3d Cir. 2002) ............................................................................ 40

\**Texas v. Johnson,*
  491 U.S. 397 (1989) ................................................................................. *passim*

*Timbs v. Indiana,*
  139 S.Ct. 682 (2019) ........................................................................................ 20

*Tinker v. Des Moines,
393 U.S. 503 (1969)............................................................................ 37, 38, 41, 42

Torres v. Madrid,
141 S.Ct. 989 (2021)........................................................................................ 25

U.S. Term Limits v. Thornton,
514 U.S. 779 (1995)........................................................................................ 22

* United States v. Ballin,
144 U.S. 1(1892)...................................................................................... passim

United States. v. Brewster,
408 U.S. 201 (1972)............................................................................ 9, 13, 17, 32

United States v. Cabrales,
524 U.S. 1 (1998)............................................................................................ 20

United States v. Grace,
461 U.S. 171(1983)......................................................................................... 37

United States v. Hvass,
355 U.S. 570 (1958)..................................................................................... 26, 27

United States v. Johnson,
383 U.S. 169 (1966)........................................................................................ 13

United States v. O'Brien,
391 U.S. 367 (1968)........................................................................................ 38

Unites States v. Rostenkowski,
59 F.3d 1291 (D.C. Cir. 1995).......................................................................... 6, 26

United States v. United Foods, Inc.,
533 U.S. 405 (2001)............................................................................... 37, 43, 44

United States v. Verdugo-Urquidez,
494 U.S. 259 (1990)........................................................................................ 27

Vander Jagt v. O'Neill,
699 F.2d 1166 (D.C. Cir. 1983)........................................................................... 6

Walker v. Jones,
733 F.2d 923 (D.C. Cir. 1984).................................................................... passim

*Washington Activity Group v. White*,
  342 F. Supp. 847 (D.D.C. 1971) .................................................................. 28

*Watkins v. United States,*
  *354 U.S. 178 (1957)* ................................................................................... 25

*Weiss v. U.S.*,
  510 U.S. 163 (1994) .................................................................................... 22

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943) .................................................................................... 43

*Wooley v. Maynard,*
  *430 U.S. 705 (1977)* ............................................................................... 43, 44

*Yellin v. United States,*
  374 U.S. 109 (1963) ............................................................................. 5, 6, 25

**Constitutional Provisions/Statutes/Rules**

\* U.S. Const., Article I, § 5................................................................. *passim*

\* U.S. Const., Article I, § 6................................................................. *passim*

\* U.S. Const., Article I, § 7…............................................................... *passim*

\* U.S. Const., Amend. I .................................................................... *passim*

\* U.S. Const., Amend. XXVII…......................................................... *passim*

2 U.S.C. § 4523........................................................................................ 31

28 U.S.C. § 2071 ..................................................................................... 27

H. Res. 38…........................................................................................ *passim*

Fed.R.Civ.P. 12 ................................................................................... *passim*

**Other Authorities**

1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary
  Representation Before 1832, at 151-203 (1909)....................................... 21

1 The Records of the Federal Convention of 1787 (Max Farrand ed., 1937).................. 22, 23, 24

*35 Years Later, A+ for Austinite Who Got Constitution Amended?* Austin-American Statesman (March 14, 2017). ....................................................................................................... 20

53 Cong.Rec. 1214 (1916) ........................................................................................................ 12

A Dictionary of the English Language, (1785) ..................................................................... 33, 34

Bernard Bailyn, The Ideological Origins of the American Revolution 46 (enlarged ed. 1992)... 21

Cong.Directory, 50th Cong., 1st Sess. 160 (1888) ..................................................................... 12

Cong.Globe, 32d Cong., 2d Sess. 52 (1852) ............................................................................. 12

Debates in the House of Representatives (Aug. 14, 1789), *in* The Congressional Register, Aug. 14, 1789 .................................................................................................................................. 24

Edmund Cody Burnett, The Continental Congress 420 (1941) ................................................... 22

*Federalist Paper No. 79* (May 28, 1788) .................................................................................... 25

GianCarlo Canaparo & Paul J. Larkin, Jr., *The Twenty-Seventh Amendment: Meaning and Application*, Harv. J.L & Pub. Pol'y (Sept. 2, 2021) ............................................................... 30

https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf ................................................................................................................................. 30

*https://www.smithsonianmag.com/history/where-didterm-gerrymander-come-180964118/* ....... 23

Jack N. Rakove, The Beginnings of National Politics: An Interpretive History of the Continental Congress 235 (1979). ............................................................................................................ 22

Jack P. Greene, The Quest for Power (1963) ............................................................................. 22

Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20, 1897*, 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013) ............................................... 34

\* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty Seventh Amedment,* 61 FORDHAM L. REV 497 (Dec. 1992) ........................................... 19, 20, 21, 22

Richard B. Morris, The Forging of the Union, 1781 (1987) ....................................................... 22

Robert P. Ludlum, "*The Antislavery 'Gag-Rule': History and Argument*, 26 J. Negro Hist. No. 2 (Apr. 1941) ............................................................................................................................ 28

The Eighteenth-Century Constitution: 1688-1815, at 151(E. Neville Williams ed., 1960) ......... 21

## PRELIMINARY STATEMENT

Plaintiff Members of Congress Massie, Greene, and Norman, oppose Defendants' Motion to Dismiss ("Motion") brought under Fed.R.Civ.P. 12(b)(1) and (6). Although Defendants present their enforcement of H. Res. 38 as a mere safety and health measure, the undisputed facts contradict this assertion, instead demonstrating several violations of the United States Constitution. Defendants' Motion should be denied.

## INTRODUCTION

In the era immediately in the aftermath of the Civil War, the House majority party cast aside proper respect for constitutional limitations. This unflattering legacy was recalled by the Supreme Court in *Powell v. McCormack*, 395 U.S. 486, 544 (1969), and the unconstitutional exclusion of members. Now, and treading a similar unconstitutional path, the current majority of the House of Representatives seeks to use its rulemaking authority to punish duly-elected Members of the minority party by means equally prohibited under the express language of the Constitution. *See United States v. Ballin*, 144 U.S. 1, 5 (1892).

This time, the means proffered by the House majority is its mandate requiring face coverings, but only in areas covered by cameras.[2]  Specifically, the Sergeant-at-Arms has been both "authorized and directed" to impose fines on Members who do not wear mandated face coverings in those areas, whose conduct is falsely presumed to constitute disorderly behavior. H. Res. 38; U.S. Const., Art. I, § 5, cl. 2. Then, and in violation of the 27th Amendment, such fines are levied by salary reduction, which lowers Members' compensation from what it previously was in the same session in which H. Res. 38 (hereafter "H.Res. 38," "the Resolution," or "the Rule") was enacted. U.S. Const., Amend. XXVII; Art. I, § 6, cl.1; Compl. ¶¶ 15-18.

---

[2] Compl. ¶¶ 15-21.

Contrary to Defendants' repeated assertion in their Motion, and under the Supreme Court's holding in *Ballin*, the federal courts may hear cases in which the House, by its rules, "ignore[d] constitutional restraints or violate[d] fundamental rights," or where there is no "reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained."  144 U.S. at 5.

 Here, Defendants implemented and are enforcing a rule, H.Res. 38, beyond the restraints placed on the House by the Constitution.  Specifically, while Defendants' Motion lists several "purposes" the Resolution purportedly serves, the reality is that the Resolution is only enforced against members of the minority party in the House.[3]  Members of the majority party have repeatedly violated the Resolution's requirements by accessing the House Floor without wearing masks, but they, unlike their colleagues in the minority, have done so without consequence.

Furthermore, notwithstanding what Defendants' claim are the purposes behind the Resolution, events prior to, during, and after the enactment of H.Res 38 demonstrate that the Resolution is merely being used as a speech/viewpoint-based political cudgel against Members of the minority party.[4]

The House cannot, as it did here, lower the compensation of Members in the same session in which the rule accomplishing that outcome was passed.  The House cannot fine only Members of the minority party for their conduct that is not disorderly, particularly where Members of the majority party engaged in identical behavior without consequence.  The House cannot pass rules that violate the First Amendment.  Simply put, the methods the House has

---

[3] Compl. ¶¶ 31, 34-37, 42-43.

[4] Compl. ¶¶ 14-43.

chosen under H.Res. 38, both textually and as implemented, violate the Constitution, and Defendants' Motion to Dismiss, should be denied.

## STANDARD OF REVIEW

"When reviewing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court assumes the truth of all material and factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Plaintiffs bear the burden of establishing subject matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6), the Court must accept as true all the factual allegations in the complaint and construe all reasonable inferences therefrom in the light most favorable to Plaintiffs. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996). Furthermore, the court must "draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). It is through this lens that the Court then must determine whether the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As the District of Columbia Circuit has emphasized, the plausibility standard does not impose a "probability requirement" at the pleading stage, but simply asks whether the complaint presents sufficient facts to "permit a reasonable inference" that the Plaintiffs have stated a claim. *Jones v. Horne*, 634 F.3d 588, 595 (citing *Ashcroft*, 556 U.S. 662, 677) (D.C. Cir. 2011).

## ARGUMENT

I    **The Court Has Jurisdiction To Provide Relief Against the Unconstitutional Conduct By Employees of the House of Representatives.**

Defendants, the Speaker, Sergeant-at-Arms and Chief Administrative Officer of the House of Representatives, assert that because they are House employees, and the Speaker is a Member, and because Members of the House engage in speech and debate, that they, as employees and enforcers, inherit the immunity from suit encapsulated in the Constitution's Speech or Debate Clause.  *See* U.S. Const., Art. I, § 6, cl. 1.

Defendants are wrong as far as the well pled facts of this case.  Longstanding precedent from both the Supreme Court and D.C. Circuit holds not only that congressional rules and practices are subject to judicial review where a constitutional violation is alleged, but that congressional staff (and indeed even Members) are subject to federal court jurisdiction when the challenged conduct is not a speech or debate function.  Here, the congressional staff functions at issue – providing mask enforcement and engaging in payroll deductions – are purely administrative in nature and not within the Speech or Debate Clause's ambit.

A.    **Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review.**

The circumstances under which House rules are susceptible to judicial review were established in *U.S. v Ballin*, 144 U.S. 1 (1892) (*reaff'd, NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014)).  As the D.C. Circuit observed in *Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.,* 515 F.2d 1341, 1347 (D.C. Cir. 1975), the general rule under *Ballin* is that each house of Congress's "power to make rules" under Art. I, § 5 "is a continuous power, always subject to be exercised by the house" and "absolute," but "within the limitations suggested [in the *Ballin* opinion]" (quoting *Ballin*, 144 U.S. at 5) (emphasis added).  Thus, while the House ordinarily has substantial authority to enact rules free from judicial review, that authority has outer limits, whereupon judicial scrutiny is appropriate: "[1] It may not by its rules

4

ignore constitutional restraints or [2] violate fundamental rights, and [3] there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." *Ballin*, 144 U.S. at 5.

All three circumstances allowing judicial review exist here. Each claim in this case is directed to the House exceeding the boundaries of its constitutional power.  Running afoul of *Ballin*, the House has *ignored the constitutional restraints upon its rulemaking authority*.  First, Plaintiffs allege that the implementation of punitive fines under H.Res, 38 via salary deductions explicitly violates the prohibition against salary reductions of the 27th Amendment to the Constitution.   Compl., ¶¶ 2-3, 15-18, 49-54.

Second, Plaintiffs allege that H. Res. 38 punishes members for behavior that is not "disorderly," thereby exceeding the express limitation on the House's power to punish its own Members under Article I, § 5, Clause 2 of the Constitution.  Compl. at ¶¶ 4, 56, 57.

Third, Plaintiffs allege that the implementation of H. Res. 38 abrogates the protections of Article I, §§ 6 and 7, because measures related to Members' compensation must be set as law, which requires passage by both chambers of Congress and presentment to the President (Compl. at ¶¶ 4, 56, 57), and because the implementation otherwise uses the unconstitutional means of detaining and, with the threat of massive fines, preventing Members from reaching the floor of the House to speak, debate, and vote. Compl. at ¶¶ 4, 61-67.

Fourth, Plaintiffs allege that H. Res. 38 constitutes a viewpoint-based, compelled symbolic speech, while at the same time punishing members for contrary viewpoint-based symbolic speech, in contravention of the First Amendment.  Compl. at ¶¶ 1, 69-75.

"It has long been settled . . . that rules of Congress and its committees are judicially

cognizable." *Yellin v. United States,* 374 U.S. 109, 114 (1963) (internal citations omitted).  And, "it is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules."  *U.S. v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995).  Indeed, the D.C. Circuit has already held that a congressman's 27th Amendment salary alteration claim against the Clerk of the House of Representatives is judicially cognizable.  *Boehner v. Anderson*, 30 F.3d 156, 160 (D.C. Cir. 1994).

In that same case, the Court of Appeals acknowledged the federal courts' obligation to exercise jurisdiction "when a congressman suffers an effective nullification of his vote, or if his influence is substantially diminished."  *Id.* (citing *Goldwater v. Carter,* 617 F.2d 697, 702-03 (D.C. Cir. 1979) (*en banc), vacated on other grounds,* (the Congress had no way to block the President's action terminating a treaty without Senate consent)); *Kennedy v. Sampson,* 511 F.2d 430 (D.C. Cir. 1974); *Moore v. U.S. House of Rep.,* 733 F.2d 946, 951-52 (D.C. Cir. 1984) (where Senate originated revenue bill, Representative deprived of constitutionally guaranteed opportunity to debate and vote on same prior to Senate action); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C. Cir. 1983) (minority party congressmen have standing to challenge dilution of influence when assigned less than proportionate number of committee seats). Plaintiffs have alleged just such a violation of their fundamental rights of representation here.[5]

Furthermore, the *Ballin* Court's condition that "there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained" is violated by H. Res. 38's implementation through (1) the use of salary deductions; and (2) a mask mandate that only applies in the areas of the House covered by tv cameras and is only enforced against Members of the minority party.  Once again, while the

---

[5] The *Boehner* court held that altering a congressional salary in violation of the 27th Amendment would comprise both an official and a personal injury to the Member. 30 F.3d at 160.

House certainly has the constitutional authority to enact rules for discipline and safety, it may not do so by violating the Constitution.

Hence, there can be no dispute that House rules, and the implementation of those rules, are subject to judicial review where a plausible constitutional violation is alleged.  Defendants cannot contest this principle.  Consequently, they must torture the Speech or Debate Clause beyond recognition to mean its opposite.  To that end, Defendants would have Speech or Debate encompass all functions performed within the legislative branch, regardless of whether those functions are even legislative, much less speech or debate. As common sense would suggest, performing mask enforcement and administering payroll, are neither legislative, nor speech, nor debate. Precedent confirms that understanding.

**B.   Enforcing a Mask Mandate & Administering Payroll Are Not Core Legislative Functions Covered By the Speech or Debate Clause.**

The Speech or Debate Clause does not insulate from suit legislative functionaries, or even members, carrying out non-legislative tasks.  *Doe v. McMillan*, 412 U.S. 306, 315 (1973). Congressional employees may accrue Speech or Debate immunity from suit "insofar as the conduct of the [employee] would be a protected legislative act if performed by the Member himself."[6] *Rangel v. Boehner*, 785 F.3d 19, 24-25 (D.C. Cir. 2015) (quoting *Gravel v. U.S.*, 408 U.S. 606, 618 (1972)).  "Legislative acts are those 'generally done in a session of the House by one of its members in relation to the business before it.'"  *McCarthy v. Pelosi,* 5 F.4th 34, 39 (D.C. Cir. 2021) (emphasis added) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204, (1880)). In general, the Supreme Court has followed a functional approach to

---

[6] Though they brush quickly past it, Defendants concede this crucial distinction between legislative and non-legislative acts.

legislative immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982).  "The key consideration, the Supreme Court cases teach, is the *act* presented for examination, not the *actor*."  *Rangel v. Boehner*, 20 F. Supp. 3d 148, 171 (D.C.D. 2013) (emphasis added by *Rangel*), (quoting *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984) (Ginsburg, J.)).

However, even "legislative acts are not all-encompassing" of the Speech or Debate Clause.  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  "The heart of the Clause is speech or debate in either House.  Insofar as the Clause is construed to reach other matters, those matters must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.*

In *Rangel*, the D.C. Circuit summarized the kind of legislative activities that fall within the Speech or Debate Clause for both Members and employees: preparing committee reports, conducting hearings, conducting investigations, committee staff using documents for official business, communications between a congressman and his staff regarding legislative business, selecting witnesses, bill drafting, staff members' preparations for legislative activities, and, of course, voting. 785 F.3d at 24-25 (collecting cases); *see also*, *McCarthy*, 5 F.4th 34, 39 ("rules governing how Members may cast their votes [ ] concern core legislative acts").

In contrast, numerous activities well within the normal course of a legislator's or congressional staff's duties have been held not to be protected by the Speech or Debate Clause: Contacting executive branch employees and agencies and seeking to influence them, privately publishing documents obtained in the course of congressional duties; assistance in obtaining government contracts, preparing constituent newsletters, press releases, speeches and documents

delivered outside of Congress  *See, e.g., Gravel*, 408 U.S. at 624-26; *United States. v. Brewster*, 408 U.S. 501, 512-13 (1972); *Doe*, 412 U.S.306 at 317.  Moreover, non-legislative functions occurring within the legislative branch, such as an opening prayer by a chaplain employed by the House, or personnel actions in the course of superintending congressional food service facilities, are also plainly not subject to the Clause's immunity.  *See, e.g., Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019); *Walker*, 733 F.2d at 930-32.

As then-Judge Ginsberg pointed out in *Walker,* the argument that every administrative function performed by the House falls within the Speech or Debate Clause is "far-fetched." *Walker*, 733 F.2d at 931.  In *Walker*, a woman who managed the House of Representatives' restaurants brought suit for unlawful discharge against the Congressman who chaired the subcommittee overseeing the restaurants and his staff director. *Id.* at 925.  The defendant Congressman and staffer moved to dismiss the suit under Fed.R.Civ.P. 12, invoking the Speech or Debate Clause immunity under the theory that the plaintiff's discharge was a "legislative act because it was reached and effected in committee" and that "food service caters to a need essential to the [House's] internal functioning."  *Walker*, 733 F.2d at 925, 927.  Judge Ginsburg made short work of this argument, explaining:

> Personnel who attend to food service, medical care, physical fitness needs, parking,[7] and haircutting for members of Congress no doubt contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business. But these staff members, unlike those who help prepare for hearings or assist in the composition of legislative measures, cater to human needs that are not "intimately cognate," *Davis v. Passman*, 544 F.2d at 879, to the legislative process. The "fundamental purpose" of the Speech or Debate Clause is to "free the legislator from executive and judicial oversight that realistically threatens to control his conduct *as a legislator*." *Gravel v. United States*, 408 U.S. at 618 (emphasis added). Auxiliary services attending to human needs or

---

[7] It bears noting that "parking" refers to a security/health function, such as protecting and restricting access to parking garages for the benefit of Members, it is not merely a convenience for Members.

interests not peculiar to a Congress member's work qua legislator may advance a member's general welfare. To characterize personnel actions relating to such services as "legislative" in character, however, is to stretch the meaning of the word beyond sensible proportion. Selecting, supervising, and discharging a food facilities manager, we believe, is not reasonably described as work that significantly informs or influences the shaping of our nation's laws.

Nor do we grasp why consideration or a vote in committee should place all personnel superintendence of auxiliary services of a nonlegislative character inside a legislative sphere. Assuming arguendo that anything done in committee is necessarily a legislative act, Walker's complaint against [the defendant congressman and staff director] nonetheless survives a Rule 12(b) motion. *Walker*, 733 F.2d at 931 (italics in original) (underline added).

Simply put, the constitutional test for speech or debate tracks the common-sense notion that the vast array of administrative functions performed by the House do not fall within the Speech or Debate Clause unless they are integral to the core legislative functions of deliberation and communication among members concerning the public's business.

Defendants point to no contrary case suggesting that their administrative functions of mask enforcement and payroll deductions might constitute "legislative acts."  Nor can they, because "the Clause has not been extended beyond the legislative sphere."  *Gravel*, 408 U.S. at 624-25.  Defendants invoke *Consumers Union of U.S.* for the proposition that by merely adopting internal disciplinary rules, the "administration and enforcement" of such House rules "are obviously legislative acts that fall squarely within the Clause."  *Consumers Union*, 515 F.2d 1341 (D.C. Cir. 1975).  However, *Consumers Union* says no such thing.  That case involved the refusal of the houses of Congress (through their employees and delegees) to accredit a certain periodical for the press gallery.  *Consumers Union*, 515 F.2d at 1342.

And, *Consumers Union* rested on two rationales, neither of which are applicable here. First, the court noted the right of each house under Art. I, § 5 to determine its own rules has,

since the very first Congress, always included the authority to decide whether and which members of the public–particularly the press–have access to its proceedings. *Id.* at 1343-47. "Under th[ese] circumstances," the case was "nonjusticiable because it involves matters committed by the Constitution to the Legislative Department." *Id.* at 1346. By contrast, the instant case involves four constitutional limitations on congressional rules that were not present in *Consumers Union*: (1) the prohibition on salary alteration under the 27th Amendment; (2) the prohibition against punishing members for behavior that is not "disorderly" under Article I, § 5, Clause 2; (3) modification of compensation in contravention of Article I, §§ 6 and 7; and (4) a First Amendment violation for compelled viewpoint-based symbolic speech and punishment for symbolic speech that exerts a contrary viewpoint.

As made manifest in the foregoing discussions in *Ballin* and *Boehner*, transgressions of limitations contained in the Constitution are plainly justiciable, a point the D.C. Circuit reiterated just two years ago in *Barker*. 921 F.3d at 1128 ("Congress may not by its rules ignore constitutional restraints or violate fundamental rights.") (quoting *Ballin*, 144 U.S. at 5).

Second, and as the D.C. Circuit also emphasized in *Barker* (which explicated *Consumers Union*), the Speech or Debate Clause was implicated in *Consumers Union* precisely because allowing press access to Congress brought with it direct press interference in congressional deliberations:

> Essential to that determination [in *Consumers Union*] was the fact that Congress itself had developed the press gallery rules to protect legislators' independence: Congress designed the rules to ensure that the galleries would be used by bona fide reporters who would not abuse the privilege of accreditation by importuning Members on behalf of private interests or causes. *Consumers Union*, 515 F.3d at 1347. As we explained in a later case, because the Association's denial of the organization's application involved regulation of the very atmosphere in which *lawmaking deliberations* occur, the

> Speech or Debate Clause barred us from hearing the suit. *Walker v. Jones*, 733 F.2d 923, 930 (D.C. Cir. 1984).[8]

*Barker*, 921 F.3d at 1128 (emphasis in original).  Here, no such consideration of lawmakers' independence exists; indeed, the opposite is true: Defendants are using H. Res. 38 to dissuade and punish Republican members of Congress from being able to speak or debate based on viewpoint.[9]

  *Barker* involved the House Chaplain invoking the Speech or Debate Clause to claim immunity from suit by an atheist seeking to lead the House in prayer as a guest chaplain.  *Barker*, 921 F.3d at 1121.  The D.C. Circuit held that "[the House chaplain's] administration of the guest chaplain program is not an integral part of the House's deliberative and communicative processes.  Judicial review of Conroy's conduct thus poses no threat to 'the integrity of the legislative process.'" *Id.*  Just as a chaplain's prayer prior to House deliberations does not "regulate the very atmosphere in which lawmaking deliberations occur" and "poses no threat to the integrity of the legislative process," neither does enforcing mask wearing or the administration of payroll deductions. *Id.* (internal citations and quotations omitted).

  Defendants also rely on *Rangel v. Boehner*, a case that falls flat for Defendants because Congressman Rangel's complaint was directed explicitly to communications by House staff members during the House Ethics Committee's investigation of his misconduct.  785 F.3d 19,

---

[8] After 1802, "reporters were permitted on the floors of the Senate and House. This privilege apparently was abused with considerable frequency by journalists importuning Members on behalf of various claims before Congress. (Cong.Globe, 32d Cong., 2d Sess. 52 (1852)). For that reason and the growing congestion on the floors, both Houses finally enacted rules permanently removing the press from the floors of Congress. Press galleries above the floors were eventually established and in 1888 the Senate (Cong.Directory, 50th Cong., 1st Sess. 160 (1888)), and 1916 the House (53 Cong.Rec. 1214 (1916)), entrusted their management to a Standing Committee of Correspondents." *Consumers Union*, 515 F.2d at 1343.

[9] The *Consumers Union* court rested its decision in part on the undisputed assumption that the Defendants there were acting in good faith. *See* 515 F.2d at 1350. Plaintiffs make no such concession here, and, as stated in the Amended Complaint, contend that H.Res. 38 is not only unlawful, but being implemented in a discriminatory and malign manner intentionally harassing members of the House minority. Compl. ¶¶ 31-43.

21-22. Because those staff members were doing their work in place of, and at the direction of, Members themselves, and disciplinary proceedings are a function that Members historically have done themselves (prior to the growth of Congress and its reliance on staff), the *Rangel* court came to the obvious conclusion that the activities of the Members' staffs were quintessentially legislative in character, and well within the Clause's immunity that derivatively applies to staff because it applies to Members themselves. 785 F.3d at 23-25.

In contrast, carrying out mask enforcement and payroll deductions are not remotely "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings," nor do they constitute "other matters which the Constitution places within the jurisdiction of the House." *Gravel,* 408 U.S. at 624-25. Notwithstanding Defendants' wishful thinking here, "the Clause has not been extended beyond the legislative sphere." *Id.* Simply put, the Speech or Debate Clause does not reach conduct "that is in no wise related to the due functioning of the legislative process." *Id.* at 625 (quoting *U.S. v. Johnson*, 383 U.S. 169, 172 (1966)).

In fact, it has been held that "the only reasonable reading of the Clause, consistent with its history and purpose, is that it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Brewster*, 408 U.S. 501, 528. So, while providing mask enforcement and administering payroll may well be important functions that contribute to the well-being of Members and the smooth running of House operations, the desirability of those activities does not convert them into legislative activities, much less speech or debate. *See Walker*, 733 F.2d at 931. Accordingly, the Speech or Debate Clause's immunity from suit is not available to Defendants here.

**C.      To Prevent Illegal Conduct, House Employees Are Not Immune from Suit, Even if the Members of Congress Who Authorized that Conduct Are Immune.**

Defendants falsely claim that because the actions they take to execute H. Res. 38 are taken pursuant to a rule enacted as part of the legislative process for which Members themselves are immune, they "inherit" that immunity as implementing employees and Members.

The Supreme Court categorically rejected this reasoning in *Gravel.* 408 U.S. at 618-622. *Gravel* made plain that the deliberations, communications, and debate by Members and their staff are an entirely different function from carrying out a deed, which must be analyzed on its own merits. *Id.*

In *Gravel,* three controlling cases were discussed.  First, in *Kilbourn v. Thompson,* the Court held that the Speech or Debate Clause:

> [p]rotected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest. The Court quoted with approval from *Stockdale* v. *Hansard*, 9 Ad. & E. 1, 112 Eng. Rep. 1112 (K. B. 1839): "'So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer.'" 103 U.S. at 202. The Speech or Debate Clause could not be construed to immunize an illegal arrest even though directed by an immune legislative act.

*Gravel*, 408 U.S. at 618-19 (emphasis added) (quoting *Kilbourn*, 103 U.S. at 200, 202).

Second, the Court in *Gravel* noted that it similarly had held in *Dombrowski v. Eastland* that Speech or Debate immunity would protect a Senator, who was a subcommittee chairman, but not the committee counsel "who was charged with conspiring with state officials to carry out an illegal seizure of records that the committee sought for its own proceedings.  The committee counsel was deemed protected to some extent by legislative privilege, but [the

14

immunity] did not shield him from answering as yet unproved charges of conspiring to violate the constitutional rights of private parties.  Unlawful conduct of this kind "the Speech or Debate Clause simply did not immunize." *Gravel*, 406 U.S. at 619-20 (citing *Dombrowski*, 387 U.S. 82, 84 (1967)).

Finally, *Gravel* pointed out that in *Powell* , wherein the Court invalidated the House's exclusion of Representative-elect Adam Clayton Powell, the Court had "afford[ed] relief against House aides seeking to implement the invalid resolutions. The Members themselves were dismissed from the case because they were shielded by the Speech or Debate Clause both from liability for their illegal legislative act and from having to defend themselves with respect to it." *Gravel*, 406 U.S. at 620 (citing *Powell*, 395 U.S. at 506 ("though this action may be dismissed against the Congressmen … petitioners are entitled to maintain their action against House employees and to judicial review of the propriety of the decision to exclude petitioner Powell").

In sum, *Gravel* explained:

> [i]mmunity was unavailable [to congressional employees] because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection. The three cases [*Kilbourn, Dumbrowski,* and *Powell*] reflect a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings.

> In *Kilbourn*, the Sergeant-at-Arms was executing a legislative order, the issuance of which fell within the Speech or Debate Clause; in [*Dumbrowski*], the committee counsel was gathering information for a hearing; and in *Powell*, the Clerk and Doorkeeper were merely carrying out directions that were protected by the Speech or Debate Clause. In each case, protecting the rights of others may have to some extent frustrated a planned or completed legislative act; but relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act. No threat to legislative independence was posed, and Speech or Debate Clause protection did not attach.

*Gravel*, 408 U.S. at 620-21 (emphasis added). *McCarthy*, to which Defendants point, is not to the contrary, as the court specifically acknowledged that the act at issue there, i.e., voting by proxy, was a core legislative act, as were the acts required of House staffers to implement the rule at issue. 5 F.4th at 39.

This Circuit likewise recognizes the distinction between legislative acts and execution thereon for purposes of ascertaining when Speech or Debate immunity applies. As then-Judge Ginsberg pointed out: "The Supreme Court has drawn a key distinction, 'between legislative speech or debate and associated matters such as voting and committee reports and proceedings,' on the one hand, and 'executing a legislative order,' or 'carrying out legislative directions,' on the other hand. The former, the Supreme Court has emphasized, is what the Speech or Debate Clause shields." *Walker*, 733 F.2d at 931-32 (cleaned up) (citing *Gravel,* 408 U.S. at 620-21; *Doe*, 412 U.S. 306, 314-15). Carrying out a decision, "even if the decision itself is properly called 'legislative,' is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects -- the *process* leading up to the issuance of legislative directions." *Walker*, 733 F.2d at 932 (emphasis in original). Members of Congress may have immunity for discussing and voting for an unconstitutional rule. But congressional employees, like the Sergeant-at-Arms and Chief Administrative Officer, are not immune from a judicial order forbidding the implementation of such a rule.

As in *Powell*, 395 U.S. 486, "House employees acting pursuant to express orders of the House does not bar judicial review of the constitutionality of the underlying legislative decision." *Id.* at 504, *citing Kilbourn*, 103 U.S. 168 (finding House Sergeant at Arms liable and a proper party in a case involving wrongful imprisonment). *Powell* provides some support that Defendant Pelosi is not a proper Defendant – after all, in that case, the House members were dismissed

16

under Speech and Debate Clause immunity.  But two cases stand for the proposition that she is not immune insofar as her purely administrative duties (which are challenged here) are concerned.

The Speech and Debate Clause protects against inquiries into "how [a Member] spoke, how he debated, how he voted," or votes or speech in the chamber or in committee.  *Fields v. Office of Johnson*, 459 F.3d 1, 9 (D.C. Cir. 2009) (*citing Brewster*, 408 U.S. 501, 526).  It also protects acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."  *Id., citing Gravel v. United States*, 408 U.S. 606, 625 (1972).

And the Clause provides further protection in precluding "inquiry. . . into the motivation for" acts "that occur in the regular course of the legislative process."  *Id.*  But the Speech or Debate Clause "does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions," or because it is merely "related to," as opposed to "part of," the "due functioning" of the "legislative process."  *Id.* at 10.

However, "some personnel decisions would not qualify" for such immunity.  *Id.* at 10. "The legislative process at the least includes 'delivering an opinion, uttering a speech, or haranguing in debate'; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and "introducing material at Committee hearings."  In contrast, "many personnel decisions by Members' personal offices lack even 'some nexus,' …to these types of legislative acts."  *Id.* at 11.

In *Fields*, the acts were determined not to be legislative because it was not "necessary to inquire into how [the Member] spoke, how he debated, how he voted," or debate in the chamber or in a committee in order to make out a violation" of the Accountability Act.  *Id.* at 13.

In *Walker*, 733 F.2d 923, the D.C. Circuit Court of Appeals again articulated a standard that "execution of a decision, even if the decision itself is properly called 'legislative,' is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects -- the process leading up to the issuance of legislative directions."  *Id.* at 932.

Under *Walker*, Defendant Pelosi is a proper Defendant if: (a) she is not sued in connection with the enactment or passage of any challenged legislation itself (and she is not); (b) she is not questioned in connection with such enactment or passage of legislation (and she will not be); but rather (c) is sued solely in connection with administrative directives she gave to Walker or Spzindor to engage in enforcement of the mandates outside of official directives from the floor (which is the scope of her involvement in this matter).  (Compl. ¶¶ 8, 24).

**II      Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted.**

**A.      The Fines Levied Under the Rule Violate the Twenty-Seventh Amendment by Varying (Reducing) Members' Actual Compensation.**

The Twenty-Seventh Amendment plainly states that "No law varying the compensation for the services of the Senators and Representatives shall take effect, until an election of Representatives shall have intervened." U.S. Const., Amend. XXVII.

**1.      A primary purpose of the 27th Amendment is to prevent the reduction of Congressional salaries, a practice the Founders expressly recognized could be used to threaten the integrity and independence of Members, and dissuade individuals of modest means from serving in Congress.**

What is today known as the Twenty-Seventh Amendment began its path to enactment

as the second amendment in the original Bill of Rights draft proposed by James Madison and adopted by the First Congress in 1789.[10] *See generally,* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 FORDHAM L. REV. 497, 521-31 (Dec. 1992) ("*Sleeper*").  Between 1789 and 1791, this "compensation amendment" was ratified by only six states, making it ineligible to join the ten amendments that were approved as the Bill of Rights. *Id.* at 532-33.  In response to a large (and retroactive) pay increase Congress granted itself in 1873 which became publicly known as the "Salary Grab," Ohio added its name to the states ratifying the amendment that year.  *Id.* at 534. Then, nothing happened to the amendment for more than 100 years, until 1978, when Wyoming also ratified it. *Id.* at 537. Next, Maine ratified the proposed amendment in 1983, beginning a cascade of state ratifications,[11] with Michigan providing the 38th approval necessary to make it the 27th Amendment to the Constitution in 1992.  *Id.* at 537, 539 n.214.

     While the 27th Amendment is commonly thought of today as a limitation on Congress' ability to vote itself a pay raise, that was merely but one of the purposes animating its origination

---

[10] The original proposed first amendment concerned the maximum number of people who would be represented by each Member of the House. *See Sleeper*, 61 FORDHAM L. REV. at 530-31 N.171 (citing Creating the Bill of Rights: The Documentary Record from the First Federal Congress) (Helen E. Veit et al. eds. 1991). Madison's proposed amendments three through twelve were ratified by a sufficient number of states in 1791, becoming what we know today as the Bill of Rights. *See Sleeper*, 528-31.

[11] The sudden interest in the long-moribund proposed amendment was driven by Gregory D. Watson, a sophomore at the University of Texas-Austin, who, while looking for a paper topic for a government class, discovered that the proposed amendment could be ratified because, unlike for later amendment proposals, Congress had put no time limit for state ratifications. He wrote his paper on it, arguing that the amendment could–and should–be ratified. Unimpressed, his professor gave him a "C," telling him the amendment was a "dead letter and would never become part of the Constitution." *Sleeper*, 61 FORDHAM L. REV. at 536-37. Undeterred, Watson began a one-man, decade-long crusade for the amendment's ratification. After his success, his professor retroactively changed his grade to an "A" in 2017. Ken Herman, Herman: *35 Years Later, A+ for Austinite Who Got Constitution Amended?* Austin-American Statesman (March 14, 2017).

and ratifications.[12] Defendants fall into this trap as they acknowledge only the limitation on congressional self-enrichment as a rationale for the Amendment, but fail to address the other purposes. By way of response, had pay raises been the only concern, the language would have stated as much. But its plain language prohibits any law "varying the compensation," not just those that increase it.

Americans' understanding of British parliamentary practice is vital to construing the purpose of the Constitution they adopted in 1787. *See, e.g, Timbs v. Indiana*, 139 S.Ct. 682, 695 (2019) (Thomas, J. concurring) (looking to Parliamentary practice in construing the meaning of the Eighth Amendment's Excessive Fines Clause); *U.S. v. Cabrales*, 524 U.S. 1 n.1 (1998) (Ginsburg, J.) (in construing Constitution's criminal venue requirement, pointing to American colonists' negative reaction to Parliament's practice of haling Americans to Britain for trial); *Engel v. Vitale*, 370 U.S. 421, 425-27 (1962) (in construing Establishment Clause, discussing Americans' negative reaction to Parliament dictating religious practices); *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927) (noting Parliamentary power in determining Congressional constitutional authority to compel witness testimony).

In addition to the threats posed by congressional self-aggrandizement, the Founders were also greatly concerned that diminishing congressional pay could be used to pressure Members from exercising independent judgment and to prevent qualified men of modest means from serving in the new national legislature. The founding generation was well-aware, for instance, of the practice of candidates for the British House of Commons of promising to reduce (or even eliminate!) their wages to garner popularity with their constituents, which had that very effect.

---

[12] Ratifications *after* the founding period were clearly motivated by opposition to particular pay increases which Congress voted for itself at various points during the 203-year ratification process for the 27th Amendment. *See Sleeper* at 533-40.

*Sleeper* at 500-01.[13] Americans in the 1770s and 1780s found such conduct debasing to the notion of representative government, and believed it had "led members of Parliament to override the Americans' rights under the British constitution" *Id.* at 501.[14]

Similarly relevant in ascertaining constitutional meaning is the Founders' understanding of the colonial and state legislative practices prior to 1789. *See, e.g., Kisor v. Wilkie*, 139 S.Ct. 2400, 2437 (2019) (Gorsuch, J., concurring) (noting colonial legislative interference with judicial independence in the context of evaluating permissible deference under the Constitution executive rulemaking); *Horne v. Dept. of Agric.,* 576 U.S. 351, 359 (2015) (analyzing Takings Clause with reference to the New York Legislature's reaction to property seizures by the Continental Army); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.,* 536 U.S. 88, 94-95 (2002) (analyzing Article III's alienage jurisdiction with reference to state legislatures' practices during and after the Revolutionary War).

From 1774 until the Constitution's ratification in 1789, during the Continental Congresses and into the period of the Articles of Confederation, state legislatures, who were responsible for paying their congressional delegates, used that leverage to punish Congress for ignoring state interests, and those delegates were an easy target for fiscal belt-tightening during the poor economy that followed the American Revolution.  *Sleeper* at 501- 02.[15] Delegates had to wait longer and longer to be paid, if at all.  "Even those delegates who had independent

---

[13] Citing 1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary Representation Before 1832, at 151-203 (1909).

[14] Citing 1 Porritt. at 96-98; The Eighteenth-Century Constitution: 1688-1815, at 151-52 (E. Neville Williams ed., 1960); Bernard Bailyn, The Ideological Origins of the American Revolution 46-51, 85-93, 130-138 (enlarged ed. 1992).

[15] Citing Jack P. Greene, The Quest for Power (1963); Edmund Cody Burnett, The Continental Congress 420, 421, 425, 629, 650, 710, 713 (1941); Richard B. Morris, The Forging of the Union, 1781-1789, at 91-94 (1987); Jack N. Rakove, The Beginnings of National Politics: An Interpretive History of the Continental Congress 235-38 (1979).

means, and thus did not rely on the small salaries paid by the states, did not accept this situation lightly.  Notable American politicians began to write scathing letters to their home states, demanding to know how long they were to serve their country without being paid for it."  *Id.* at 502.

Hence, the new national legislature's independence and stability was a major concern at the 1787 Constitutional Convention. *Id.*[16]  In discussing how congressional pay should be set in the context of debating what eventually became known as the Constitution's "Ascertainment Clause,"[17] the delegates avidly debated the potential harms of insufficient congressional remuneration, or its potential diminishment.  These discussions are highly relevant in ascertaining the Founder's concerns regarding congressional compensation.  *See, e.g., Rucho v. Common Cause*, 139 S.Ct. 2484, 2495 (2019) (referring to the Convention debate in ascertaining the authority granted under Article I's Election Clause); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 790-91 (1995) (analyzing the meaning of Article I's Qualifications Clause with reference to the Convention discussions); *Weiss v. U.S.*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) (discussing Convention debate in the context of analyzing the Appointments Clause); *Singer v. U.S.*, 380 U.S. 24, 31 (1965) (discussing the Convention's insights into the criminal venue requirement of Article III in tandem with the later-ratified Sixth Amendment); *Sch. Dist. of Abingon Twp. v. Schemp*, 374 U.S. 203, 254 n.19 (1963) (Brennan, J., concurring) (discussing Convention debates on religion to clarify later-ratified First Amendment).

Echoing the well-known concern about House of Commons candidates seeking voter

---

[16] Citing 1 The Records of the Federal Convention of 1787, at 20-22 (Max Farrand ed., 1937) (all references are to James Madison's notes unless otherwise indicated).

[17] "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States." U.S. Const., Art. 1, § 6, cl.1.

favor by promising to cut their pay, Massachusetts delegate Elbridge Gerry[18] noted "one principal evil" of democracy was "the want of due provision for those employed in the administration of Governnt [sic]. It would seem to be a maxim of democracy to starve the public servants." 1 The Records of the Federal Convention of 1787, at 48 (Max Farrand ed., 1937). Virginia delegate, George Mason, raised the problematic history of low pay discouraging capable men from public service, "[t]he parsimony of the States might reduce the provision so low as had already happened in choosing delegates to Congress, the question would be not who were most fit to be chosen, but who were most willing to serve." *Id*. at 216.  Nathaniel Gorham of Massachusetts and Edmund Randolph of Virginia both raised the threat to congressional independence created by the possibility of salary reductions.  Gorham pointed out that state legislatures "were always paring down salaries in such a manner as to keep out of offices men most capable of executing the functions of them." *Id*. at 372.  Randolph, in turn, stressed that "[i]f the States were to pay the members of the Natl. Legislature, a dependence would be created that would vitiate the whole System." *Id.* (emphasis added).  In stark contrast, only one delegate, Benjamin Franklin, suggested that federal legislators should receive no salary whatsoever, a suggestion the other delegates tabled without comment.  *Id.* at 81-85.

With the proposed Constitution setting no restraint on either increasing or decreasing congressional salaries, it became the second of Madison's proposed amendments in the Bill of Rights he offered in the First Congress.  As in the Constitutional Convention, Representatives discussed the sorry history of the House of Commons manipulating wages.  Congressman

---

[18] Later Governor of Massachusetts, Gerry gifted his name to the American political lexicon in the word "gerrymandering." *See generally, https://www.smithsonianmag.com/history/where-didterm-gerrymander-come-180964118/.*

Theodore Sedgwick stated that "'designing men'… … might reduce the wages very low, much lower than it was possible for any gentleman to serve without injury to his private affairs, in order to procure popularity at home, provided a diminution of pay was looked upon as a desirable thing; it might also be done in order to prevent men of shining and disinterested abilities, but of indigent circumstances, from rendering their fellow citizens those services they are well able to perform, and render a seat in this house less eligible than it ought to be." Debates in the House of Representatives (Aug. 14, 1789), *in* The Congressional Register, Aug. 14, 1789.

This view, too, demonstrates that diminution of salary was as much a consideration for the Founders as were pay raises. *See, e.g., Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1903 (2021) ("Since the First Congress also framed and approved the Bill of Rights, we have often said that its apparent understanding of the scope of those rights is entitled to great respect."). It is beyond dispute that based on the Revolutionary dismay over Parliamentary reductions in pay, the Founders well understood, in proposing the 27th Amendment, that financial means should not be used to dissuade national legislators from independent judgment, and financial means should not be used in an attempt to exclude those of modest means from public service. Those critical concerns are precisely what underlie this case: The manipulation of salary by the House Democratic Majority to deprive Republican Members of their political independence and financial ability to serve. "In the general course of human nature, a power over a man's subsistence amounts to a power over his will." Alexander Hamilton, *Federalist Paper No. 79* (May 28, 1788). *See also Schaffer v. Clinton*, 240 F.3d 878, 884-85 (10th Cir. 2001) (noting that Hamilton was speaking of a *decrease* in pay, and that such a decrease would be a real injury providing standing under the 27th Amendment). The 27th Amendment was enacted not just to

prevent congressional self-dealing from pay increases, but to protect Members from pay *decreases* being used as an instrument for either political pressure or exclusion.

2. **H. Res. 38 is a "Law" that Varies Compensation in Violation of the 27th Amendment.**

The text and tradition of a constitutional provision control its interpretation. *See, e.g,, Torres v. Madrid,* 141 S.Ct. 989, 995-96 (2021) (referencing a dictionary definition from 1828 when examining the meaning of the term "seizure" in the Fourth Amendment); *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (the Constitution's "words and phrases were used in their normal and ordinary as distinguished from technical meaning," as understood by ordinary voters); *see also, Callins v. Collins*, 510 U.S. 1141 (1994) (Scalia, J., concurring) (examining the text of the fifth amendment when defining the scope of a prohibition on the death penalty). Notwithstanding Defendants' pleas to the contrary, H. Res. 38 is a "law" for purposes of the 27th Amendment. By its plain terms, the Amendment applies not just to "statutes," but to "law." Nothing in the text or the history of the Amendment suggests that "no law" applies only to statutes enacted pursuant to bicameralism and presentment. The opposite is true. The Supreme Court, the D.C. Circuit, this Court, and Congress itself all recognize that a congressional rule is a "law" subject to the provisions of the Constitution.

"[T]he courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members." *Exxon Corp. v. FTC*, 589 F.2d 582, 590 (D.C. Cir. 1978) (citing *Yellin*, 374 U.S. 109, 143-144; *Watkins v. United States*, 354 U.S. 178, 188 (1957); *Ballin*, 144 U.S. 1, 5; *Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963)). "The Bill of Rights is applicable to . . . all forms of governmental action." *Watkins*, 354 U.S. at 188. Where constitutional rights are violated, the judiciary has warrant to interfere with Congress's internal procedures. *Exxon*, 589 U.S. at 590. As already explained in Part I.A., *supra*, the Supreme Court

25

expressly held in *Ballin* that the houses of Congress "may not by [their] rules ignore constitutional restraints or violate fundamental rights." 144 U.S. at 5. Unambiguous House rules, such as the mandatory payroll deduction of punitive fines required under H.Res. 38, are plainly subject to judicial review. *Rostenkowski*, 59 F.3d 1291, 1307.

Defendants mistakenly rely on *Boehner v. Anderson* for the proposition that only statutes that are the product of bi-cameralism and presentment are a "law" for purposes of the 27th Amendment.  Mot. at 15-16, citing 30 F.3d 156 (D.C. Cir. 1994).  The *Bohener* court made no such suggestion, and the case did not even purport to pose the question of what governmental actions constituted a "law" under the Amendment.  *See id.* at 158-59.  The only "law" at issue there was a statute challenged by then-Congressman Boehner that authorized automatic cost-of-living increases in subsequent sessions of Congress. *Id.*  The D.C. Circuit rejected Boehner's argument, correctly holding that nothing in the 27th Amendment obligated Congress to enact a new law for each separate pay raise; only an intervening session between the enacting law and any subsequent pay adjustment was required by the plain language of the Amendment. *Id*. at 160-62.

Like the houses of Congress, the federal courts are empowered to enact their own rules, and the Supreme Court has held that a local court rule was a "law" for purposes of the federal perjury statute.  *U.S. v. Hvass*, 355 U.S. 570, 574-75 (1958).  Incorporating the common understanding that a "rule" issued by a governmental institution with binding effect is a "law," the *Hvass* Court explained:

> The phrase "a law of the United States," as used in the perjury statute, is not limited to statutes, but includes as well Rules and Regulations which have been lawfully authorized and have a clear legislative base.  28 U.S.C. § 2071 provides: "The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business.  Such rules shall be

> consistent with Acts of Congress and rules of practice and procedure
> prescribed by the Supreme Court." . . . Consistently, Rule 83 of
> Federal Rules of Civil Procedure, in pertinent part, provides: "Each
> district court by action of a majority of the judges thereof may from
> time to time make and amend rules governing its practice not
> inconsistent with these rules. . . " These statutes and Rule 83 leave
> no room to doubt that the District Court was lawfully authorized to
> prescribe its local rules and that they have a clear legislative base.

*Id.* at 575-76 (citations omitted); *Columbia Broadcasting System, Inc. v. U.S.*, 316 U.S. 407, 416

(1942) (an agency rule that has binding legal effect on those it regulates is a "law").

Here, the House issued a rule with binding legal effect on its Members, which makes it a

"law" for purposes of constitutional scrutiny.  "When seeking to discern the meaning of a word

in the Constitution, there is no better dictionary than the rest of the Constitution itself."  *Arizona*

*State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 829 (2015) (Roberts, C.

J., dissenting); *cf. Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 60 (2014) (Kagan, J., for the

Court) ("'[W]ords repeated in different parts of the same statute generally have the same

meaning'" (quoting *Law* v. *Siegel*, 571 U.S. 415, 422 (2014)).  The same terminology used in

contemporaneously drafted constitutional provisions presumably carry the same meaning.  *See*

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (reasoning that "the people" is "a term of

art employed in select parts of the Constitution and has the same meaning in each part of the

Constitution").  As explained in Part II.A.1, *supra*, the term "no law" in Madison's original

proposed second amendment that became the 27th Amendment was drafted in the same Bill of

Rights proposal as the "no law" found in the First Amendment.  If "no law" in the First

Amendment covers the rules of each congressional house, so too must those rules be covered by

the "no law" provision of the 27th Amendment.

Furthermore, no less a figure than John Quincy Adams believed that a House rule was a

"law" governed by the strictures of the First Amendment.  After his Presidency ended in 1829,

Adams rejoined the House in the House in 1831.  From 1837 until 1844, the House imposed

what was infamously known as the "Gag Rule," whereby any petitions concerning slavery were

automatically tabled, with the slavery topic put off-limits for debate.  Adams strenuously argued

for  nearly eight years that the Gag Rule was an explicit violation of the First Amendment's

requirement that "Congress shall make no law . . . abridging . . . the right of the people to petition

the Government for a redress of grievances."  U.S. Const., Amend. I.  In December of 1837,

during the voting on the Gag Rule in the 25th Congress, rather than answer with a vote, Adams,

before he was silenced by calls to order, said "I hold the resolution to be a violation of the

Constitution of the United States…".  The next day he completed his remark, ' … of the rights of

my constituents, and of the people of the United States to petition, and of my right to freedom of

speech, as a member of this House.'"  Robert P. Ludlum, "*The Antislavery 'Gag-Rule': History

and Argument,*" 26 J. OF NEGRO HIST. No. 2 at 210-11 (April 1941) (internal citation

omitted).

This Court has come to a similar conclusion, holding by necessary implication that the

First Amendment's "Congress shall make no law" phrase applies even to House regulations

concerning the display of artwork in the U.S. Capitol.  *Washington Activity Group v. White*, 342

F.Supp. 847, 848-50, 852-55 (D.D.C. 1971), *aff'd*, 479 F.2d 922 (D.C. Cir. 1973).  In *White*, the

Court held that even though the houses of Congress were entitled to great deference in

formulating standards for internal governance, those standards could be invalidated if they

violated First Amendment protections.  *Id.* at 852-53.  If the House regulations in *White* weren't

"law," the court could not have found them violative of the First Amendment, which by its

terms, applies only to "law."

The untenability of Defendants' claim that their rule may escape constitutional scrutiny

because it is not a statute passed by both Houses of Congress and presented to the President is belied by the Supreme Court's recent decision in *Noel Canning*, 573 U.S. 513.  In *Noel Canning*, the Court held, consistent with its earlier jurisprudence on the justiciability of the rules of each chamber, that although the Senate's own view as to when it was "in session" under its own rules was entitled to great deference, it is ultimately the judiciary's role to determine if those decisions are consistent with the controlling constitutional provisions.  *Id.* at 551-52.

In the same vein, the D.C. Circuit held in *Michel v. Anderson*, that the judiciary had both the right and the obligation to ascertain if a House rule granting certain voting rights to Delegates from U.S. territories complied with Article I of the Constitution 14 F.3d 623, 627 (D.C. Cir. 1994) ("[W]ere the House to create members not 'chosen every second year by the People of the several states,' and bestow upon them full voting privileges, such an action, whether or not pursuant to House rules, would be blatantly unconstitutional.  Therefore, the question presented in this case–whether granting delegates the power to vote in the Committee of the Whole bestows a status equivalent to membership on the delegates–cannot be thought to have been delegated by the Constitution to the House to decide.  There are limitations to the House's rulemaking power, and Art. I, § 2 is such a limit.").  The same principal applies here: H. Res. 38 is "a law" for purposes of the 27th Amendment that this Court must not only take cognizance of, but which plainly contravenes the requirement that Member compensation not be "varied."[19]

H. Res. 38 "varies compensation" of the Members by specifically and explicitly targeting their salary.  It states: "(2) a fine imposed pursuant to this section shall be treated as though

---

[19] Defendants understandably cite to a recent essay in support of their contention that only statutes are laws limited by the Amendment. Mot. at 19-20, citing GianCarlo Canaparo & Paul J. Larkin, Jr., *The Twenty-Seventh Amendment: Meaning and Application*, Harv. J.L & Pub. Pol'y (Sept. 2, 2021) at 19-20. While an interesting philosophical rumination on what the authors think the Amendment should mean, the essay fails to grapple with a single one of the multitude of cases holding that congressional rules are constrained by constitutional strictures, and therefore, justiciable.

imposed under clause 3(g) of rule II,[20] and shall be administered as though pursuant to clause 4(d) of rule II."[21] That rule specifically targets deduction of salary. Significantly, there can be no doubt that the fines at issue are specifically, and improperly, directed against Members' salaries because the Resolution explicitly forecloses other ways Members might pay the fines in question – leaving only their salary or other personal funds to answer. This ensures maximum pressure is brought to bear on those Members who rely on their Congressional salary as their sole or primary means of support. [22]

Defendants mistakenly claim that "fines imposed and collected pursuant to House Resolution 38 do not change the 'compensation for services' of House Members." While the fines may not change the underlying salary level of $174,000 per annum, it defies logic (and math) to suggest that deducting money does not vary, i.e., reduce, those Members' actual compensation for their services. Without question the fine reduces the Member's salary before he ever receives it.

---

[20] That rule states: "(g)(1) The Sergeant-at-Arms is authorized and directed to impose a fine against a Member, Delegate, or the Resident Commissioner for the use of an electronic device for still photography or for audio or visual recording or broadcasting in contravention of clause 5 of rule XVII and any applicable Speaker's announced policy on electronic devices. (2) A fine imposed pursuant to this paragraph shall be $500 for a first offense and $2,500 for any subsequent offense." https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf (last visited 7/23/2021).

[21] That Rule states: "(d)(1) Upon notification from the chair of the Committee on Ethics pursuant to clause 3(g)(3)(C), the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner. (d)(2) The Chief Administrative Officer is authorized to establish policies and procedures for such salary deductions." (last visited 7/23/2021).

[22] The Plaintiffs in this case readily exemplify the Founder's concern for the use of pay to exert pressure, as Representative Massie relies on his Congressional salary as his primary means of support, while Representative Greene deducts nearly all of her paychecks to pay her federal withholding taxes, as she has the benefit of prior saved income from which she can sustain herself until she files her tax returns each year. Representative Massie, who lives off his Congressional salary, is facing a forcible deduction from his paychecks to pay the fine, while Representative Greene is only having approximately one dollar ($1.00) deducted from each of her remaining monthly paychecks to pay her fines, because such deductions for the fines herein occur following deductions for taxes, and she has arranged to deduct nearly all of her salary to pay taxes.

Defendants express dismay that a plain text reading of the 27th Amendment striking down H. Res. 38 might also invalidate other statutes and rules.  Mot. at 17, 21, *citing*, *e.g*, 2 U.S.C. § 4523 (authorizing the House Chief Administrative Officer to "deduct from any salary" of any Member any "delinquent sum" he owes but "fail[ed] to pay").  This statute is not at issue here, but even if Defendants are correct, it goes without saying that ratification of a constitutional amendment necessarily invalidates prior laws that violate the amendment's strictures.  *See, e.g., Neal v. Delaware*, 103 U.S. 370, 389-90 (1881) (The adoption of the 15th Amendment invalidated the provision of the Delaware Constitution restricting suffrage to whites).  In short, Defendants cannot claim that the Court should not find H. Res. 38 unconstitutional simply because there are other rules that pre-date the 27th Amendment would also unconstitutional today for the same reason.  *Powell*, 395 U.S. 486, 546-47 ("That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date.").

Furthermore, whatever authority Congress may have had to fine Members and deduct those fines directly from Member salaries prior to 1992, the 27th Amendment now precludes such authority, at least for punitive fines imposed under the guise of disciplining disorderly behavior, unless an election intervenes.[23]

## B. The Imposition of Fines for Behavior that is Not Disorderly is Beyond the Power of the House Under Article I, § 5.

Article I, § 5, clause 2 of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." Under *Ballin*, Members may be punished only for

---

[23] Plaintiffs take no position in this case on salary deductions for absences, restitution-based fines, or individual court-ordered garnishments, as such circumstances may be governed by considerations not relevant to this case, particularly where the rules establishing and authorizing these deductions pre-dated the start of the current Congress: that fact alone takes them outside the ambit of the 27th Amendment. Nor are voluntary deductions impinged by this action.

behavior that is "disorderly," which is a textual "constitutional restraint" on that for which a Member may be punished. 144 U.S. at 5. Defendants engage in self-serving circular logic by seeking to define "disorderly" as any "conduct that is 'contrary to rules'." Mot. at 23.  However, Defendants' definition reaches beyond the constitutional limit and would run contrary to a legal interpretation maxim of rendering all words in a particular provision to have meaning.  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011).  What if the House passed a rule that said votes can only be cast in favor of measures favored by the Speaker?  That would be perfectly fine according to Defendants, because failing to do so would be contrary to rules, even though it would defy the very core of legislative independence, democracy, and the purposes of Article I.

Moreover, this Court has previously held that the question of whether conduct is disorderly is reviewable.  *Rangel*, 20 F. Supp. 3d 148 at 171.  There, this Court observed that:

> To take defendants' argument to its logical extreme, imagine the House locking a Member in the basement of the Capitol for one year based only on an internal disciplinary vote. If the House's disciplinary power were truly unbridled, such a case would be nonjusticiable. But as the Court explained in the closely related context of the Rulemaking Clause in *Ballin*, the Constitution empowers each House to discipline its Members, but it may not by doing so "ignore constitutional restraints or violate fundamental rights." 144 U.S. at 5; see also *Brewster*, 408 U.S. at 544 (Brennan, J., concurring) ("Nor is the Member at the mercy of his colleagues, free to adjust as they wish his rights to due process and free expression." (*citing Bond v. Floyd*, 385 U.S. 116, 87 S. Ct. 339, 17 L. Ed. 2d 235 (1966))).

Hence, to determine whether the alleged conduct here is beyond the authority of this Court, "it is necessary to determine whether members of the House have acted outside of the zone of their discretion under the Discipline Clause—i.e., whether they have, by disciplining Rangel and by engaging in the alleged misconduct, ignored constitutional restraints." *Id., citing Ballin*, 144 U.S. at 5; *Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("Although

judicial intervention is appropriate when the failure of Congress to adhere to its own rules

implicates constitutional rights, 'Congressional practice in the transaction of ordinary business is

of course none of (the Court's) concern . . . .'" (*quoting Christoffel v. United States*, 338 U.S. 84,

88 (1949)); *Exxon Corp.*, 589 F.2d 582, 590 ("[W]here constitutional rights are not violated,

there is no warrant for the judiciary to interfere with the internal procedures of Congress." (*citing*

*Consumers Union*, 515 F.2d at 1347-48)).

Thus, this Court observed in *Rangel* that the threshold question of whether behavior is

arguably disorderly has to be reviewable.  *Id.*  Otherwise, the House could "lock[] a Member in

the basement of the Capitol for one year based only on an internal disciplinary vote[,]" which is

clearly beyond their Constitutional authority.  *Id.*

Defendants may not use the House's internal rulemaking authority to shield actions that

reach beyond the power of the House itself. *Kilbourne*, 103 U.S. at 182; *Ballin*, 144 U.S. at 5.

In the instant case, those acts include levying fines against Members' salary for behavior that is

not "disorderly." "[T]he specific enumeration of the particular classes of cases ought to be

construed as excluding all others not enumerated, upon the known maxim, . . . *expressio unius*

*est exclusio alterius. Ex parte City Bank of New Orleans*, 44 U.S. 292, 313 (1844) (Story, J.).

Here, the Discipline Clause permits the House to punish only conduct that is disorderly (a term

with substantive meaning), not just any infraction of the rules. Were it otherwise, an oppressive

House majority could enact any rule it wished to enable punishments against the minority.

Neither the Constitution itself nor any case defines the meaning of "disorderly behavior"

as used in the Discipline Clause, and it should be given its ordinary meaning as understood at the

time of ratification. Using a relevant dictionary relied upon by Defendants, the most applicable

definition of "disorderly" – used in the Constitution as an adjective – is "irregular; tumultuous,"

not the aforementioned circular definition suggested by Defendants (*i.e.*, anything that violates the rules of the House). Samuel Johnson, A Dictionary of the English Language, (1785).[24]

Plaintiffs advance the entirely plausible position – particularly in a case of first impression – that a Member walking into the House Chamber, with no suspicion or allegation of wrongdoing by that Member, is not "disorderly" behavior that can be punished by the expedient of the majoritarian House passing a rule requiring Members to submit to wearing a face covering. There is nothing "irregular or tumultuous," much less "riotous or indecent" about a Member entering into the House Chamber. In fact, there could hardly be a more ordinary occurrence in the course of a Member's day.[25] The baselessness of Defendants' claim that rule-breaking, *ipso facto*, is "disorderly conduct" is belied by the fact that no tumult arose in the House's proceedings upon the Rule's violation by Speaker Pelosi, Chairwoman Waters, and other Member of the House majority party.[26]

Defendants are executing a punishment against Members for actions that, cast in the light most favorable to Defendants' position, is two logical steps removed from disorderly behavior.[27]

---

[24] "Disorderly" is a word whose meaning has changed little, if at all, since the founding period. *See, e.g.,* Black's Law Dictionary, 6th ed., 1991 (abridged), still defined the word as: "violative of the public peace or good order; turbulent, riotous, or indecent" (exclusive of its reference to rules, that being circular in the present case).

[25] *See also,* Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20, 1897,* 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013) ("'Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour ....' Punish them, how? ... Put him in jail if he is guilty of misbehavior. If a member of the House should stagger into that body some day drunk, that is disorderly behavior. He can be fined by that body, and punished for that disorderly behavior.").

[26] Pl.'s Compl. ¶¶ 33, 35, 42.

[27] In light of the purposes Defendants argue underlie the Resolution, *see* Mot., the two logical steps of separation from disorderly behavior are, first, face coverings are required on the Floor of the House. Given that the mere act of standing on the floor of the house is not disorderly behavior, the requirement to wear a face covering is a prophylactic measure (one that might only have any utilitarian effect if a member were infected with disease) that is one step removed from disorderly behavior. Second, Defendants assert that the purpose of the Resolution is to protect health, but the mere act of walking onto the Floor of the House without a face covering cannot reasonably be deemed to be disorderly behavior, such a further prophylactic measure is a second step removed from actual disorderly conduct.

34

Again, at the current stage of pleading, the plausibility of Plaintiffs' position is all that is required to deny Defendants' Motion to Dismiss on this ground.

Defendants cite to fines that the House imposed as far back as 1856, 136 years before the 27th Amendment was ratified.  Such recitation of fines imposed prior to 1992 is inapposite, especially those that rely on explicit provisions in the Constitution other than the Discipline Clause, such as that which addresses the attendance of Members. Mot.; Art. I, § 5, cl. 1. Similarly, unchallenged fines since 1992 have no precedential value to the present case. In *Powell*, 395 U.S 486, Congress sought to exclude Representative Powell from being seated, but, *inter alia*, the Supreme Court rejected House Defendants' arguments that prior exclusions of other Members demonstrated the constitutionality of the practice.  *Id.* at 541-48.  The High Court noted that none of the cited previously excluded members had judicially challenged their exclusions. *Id.*  The *Powell* Court further held that such exclusions were unconstitutional when done for reasons beyond the limits of the Qualifications Clause. *Id*. at 550; *see also*, *Ballin*, 144 U.S. at 5.

### C.    A claim is stated for a violation of Article I, §§ 6 and 7

Article I, Section 6 provides: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law,[28] and paid out of the Treasury of the United States."  Article I, Section 7, Clause 2 provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by

---

[28] The capitalization of the term "Law," which is not capitalized in the 27th Amendment, takes on an important context in this regard.  As opposed to "law," the capitalization of the term refers expressly to the passage of a statute.  Thus, when looking at the meaning of the term "Law," in Article I, Section 6, and Article I, Section 7, the term refers to enactments of bills by Congress that have been presented to the President.

which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

There is no doubt here that the measures in question – passed by only the House – are not a "Law" within the meaning of Article I, Section 7, Clause 2. *Clinton v. City of New York*, 524 U.S. 417 (1998). Defendants claim that the fine – which is taken directly from Congressional compensation – does not vary compensation and thus is not violative of the Clause. This is merely word play, as reducing the bottom line on a paycheck is a reduction in compensation. The fact that this alteration in compensation may not be permanent does not change that Plaintiffs' compensation will be less than what the established Law says it should be, and is therefore a reduction. Further, as the Complaint makes clear, the determination on whether or when such salary reductions occur are at the whim of staffers within the House, and not Congress itself, which runs afoul of the bedrock principle behind the Ascertainment Clause: accountability. *Humphrey v. Baker*, 848 F.2d 211 (D.D.C. 1988); *Pressler v. Simon*, 428 F. Supp. 302, 305-306 (D.C.D. 1976) (by law in terms of compensation determinations must be passed laws).

## D.   A claim has been stated under the First Amendment

Defendants next erroneously claim that H. Res. 38 does not violate the First Amendment.

### 1.   Symbolic speech (going to the floor unmasked)

Symbolic speech is recognized as protected, and refusal to wear a mask on such basis, and under the circumstances presented here, is within the ambit of symbolic speech. *Texas v. Johnson*, 491 U.S. 397 (1989) (burning of the American flag symbolic speech and protected and "Government may not prohibit the expression of an idea simply because society finds the idea

itself offensive or disagreeable"); *Cohen v. California*, 403 U.S. 15 (1971) (wearing a "fuck the draft" jacket could not be criminally prohibited because the expletive, while provocative, was not directed toward anyone; besides, there was no evidence that people in substantial numbers would be provoked into some kind of physical action by the words on his jacket. Harlan recognized that "one man's vulgarity is another's lyric."); *Tinker v. Des Moines*, 393 U.S. 503 (1969) (wearing black arm bands in school protected speech where such did not "materially and substantially interfere with" the school proceedings and no disruption occurred).

Expressive conduct has long been held to be implicated in protest activity.  Including a sit-in by blacks in a "whites only" area to protest segregation, *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966); the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, *Schacht v. United States*, 398 U.S. 58 (1970); and in picketing about a wide variety of causes, *see, e. g., Food Employees v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 313-314 (1968); *United States v. Grace*, 461 U.S. 171, 176 (1983).

"Just as the First Amendment may prevent the government from prohibiting speech, [it] may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). Thus, "one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quotations omitted).

"The First Amendment literally forbids the abridgment only of 'speech,'" but the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404; *see Hurley*, 515 U.S. at 569 ("[T]he Constitution looks beyond written or spoken words as mediums of expression."). The First Amendment protects certain

expressive conduct, such as the symbolic "wearing of an armband for the purpose of expressing certain views" about the Vietnam War, *Tinker*, 393 U.S. 503, 505, and the burning of an American flag as "the culmination . . . of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President," *Johnson*, 491 U.S. at 406. Still, the Court has not "accept[ed] the view that an apparently limitless variety of conduct can be labeled 'speech.'" *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

*Spence v. Washington*, 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (per curiam), addresses whether the First Amendment protects the display of symbols. In *Spence*, a college student hung a United States flag outside his apartment window. *Id.* at 406. The flag was upside down and had a peace symbol attached to both sides. *Id.* He was arrested and prosecuted under a state statute that forbade the placement of "any . . . mark, picture, design, [or] drawing" on a flag, as well as the public display of such a flag. *Id.* at 407. The student challenged his conviction as a violation of his First and Fourteenth Amendment rights.

Noting that the student had not "articulate[d] his views through printed or spoken words," the Court asked "whether his activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 409. It concluded that "[o]n this record there can be little doubt that appellant communicated through the use of symbols." *Id.* at 410. The display of the flag "was a pointed expression of anguish" over foreign and domestic governmental affairs. *Id.* Further, "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410-11 (emphases added).

*Spence*'s "particularized message" language reappeared in *Johnson*, the flag-burning case. The Court restated that, "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (*quoting Spence*, 418 U.S. at 410-11). After describing the circumstances surrounding the flag burning, the Court noted that its "overtly political nature . . . was both intentional and overwhelmingly apparent," *id.* at 406, i.e., it communicated a particularized message that was likely to be understood. Accordingly, the flag burning was "sufficiently imbued with elements of communication to implicate the First Amendment." *Id.* (citation omitted) (quotations omitted).

*Spence* and *Johnson* asked whether a symbolic act or display was sufficiently imbued with elements of communication to trigger First Amendment scrutiny. *Johnson*, 491 U.S. at 406; *Spence*, 418 U.S. at 409. As part of this inquiry, the Court considered two relevant factors: (1) an intent to convey a particularized message, and (2) a great likelihood that the message would be understood by those who viewed the symbolic act or display. *Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410-11.

In *Hurley*, a compelled speech case involving expressive conduct, the Court suggested the *Spence-Johnson* factors are not necessarily prerequisites for First Amendment protection for symbolic speech. 515 U.S. at 566. *Hurley* concerned whether private organizers of a St. Patrick's Day parade could be required under a Massachusetts public accommodation law to "admit a parade contingent expressing a message not of the private organizers' own choosing." *Id.* The organizers objected to the admission of a group of openly gay, lesbian, and bisexual descendants of Irish immigrants. *Id.* at 561.

Before addressing the compelled speech issue, the *Hurley* Court addressed whether parades constitute First Amendment activity. The Court instructed that the "inherent expressiveness of marching to make a point," *id*. at 568, was not undermined simply because a parade might "combin[e] multifarious voices" or lack an isolated, exact message, *id.* at 570. Referring to *Spence*, the Court said that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569 (citation omitted).

Federal circuit courts have interpreted *Hurley*'s effect on the *Spence-Johnson* factors differently. The Third Circuit has said that "*Hurley* left open how courts should evaluate symbolic speech claims" and "eliminated the 'particularized message' aspect of the *Spence-Johnson* test." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002). That circuit views the *Spence-Johnson* factors as "signposts rather than requirements." *Id.*

The Second Circuit, in contrast, views the *Spence-Johnson* factors as intact after *Hurley*. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 n.6 (2d Cir. 2004) ("While we are mindful of *Hurley*'s caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted Hurley to leave intact the Supreme Court's test for expressive conduct in *Texas v. Johnson*."). The Sixth and Ninth Circuits apply the *Spence-Johnson* factors together with *Hurley*'s statement that a "narrow, succinctly articulable message is not a condition of constitutional protection." *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005) (*quoting Hurley*, 515 U.S. at 569); *Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th

Cir. 2010) (suggesting that certain expressive activities need not satisfy the *Spence-Johnson* factors). The Eleventh Circuit has concluded that *Hurley* "liberalized" the *Spence* test such that conduct is expressive if a "reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Hartland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

Is every, or even most, mask mandates, or refusal to comply with such mandates, sufficient to meet these elements?  Of course not, and thus the hypothetical question posed by Defendants about mask mandates in courthouses is not applicable.  But here, the facts militate strongly towards meeting these elements.  First, there is no doubt but that there was a communicative intent on the part of the Congressional Plaintiffs.  Part of that stems from the public nature of the act, in the Hall of the House (indeed, this is the corollary to the compelled speech issue below: the mandate was only applicable in the Hall of the House, suggesting it was meant not for public health purposes, but to convey a message in the first instance).[29]  And, second, the message was clearly understood as a protest: it was widely carried and reported by the media as a protest.  *Id.*

Turning back to *Tinker*, 393 U.S. 503, the expressive speech (at least in schools) must be "divorced from actually or potentially disruptive conduct by those participating in it." *Id.* at 505. School settings have less protection of speech than in other contexts, and in such settings there is "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507.  In *Tinker*, the Defendants "sought to punish petitioners for a silent, passive expression of opinion,

---

[29] Compl. ¶ 29.

41

unaccompanied by any disorder or disturbance on the part of petitioners." *Id.* at 508.  So too here.

As *Johnson* observed, while "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word … [i]t may not, however, proscribe particular conduct because it has expressive elements."  491 U.S. 397, 406.  "[W]hat might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate basis for singling out that conduct for proscription." *Id.*  Important to the analysis of flag burning in *Johnson* was the observation that "no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the flag." *Id.* at 408.  The protest in this case was not *actually* disruptive to any proceedings (any more than wearing white to a State of the Union was to protest the President), and therefore it was protected.

## 2.    Compelled speech (the requirement to be masked)

The compelled speech doctrine has its roots in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). In *Barnette*, the Supreme Court addressed the constitutionality of requiring public school children to engage in a "stiff-arm salute" of the American flag and to recite the Pledge of Allegiance. *Id.* at 627-28. Those who did not faced punishment for insubordination, including expulsion. *Id.* at 629. The Court held that "compelling the flag salute and pledge . . . invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.*

Over three decades later, the Court revisited *Barnette* in *Wooley v. Maynard*, 430 U.S. 705 (1977), a decision that is highly relevant to this appeal. *Wooley* concerned the constitutionality of New Hampshire's requirement that noncommercial vehicles display license plates featuring the state motto, "Live Free or Die." 430 U.S. at 713. The plaintiffs, a husband and wife, were Jehovah's Witnesses who wished not to display the motto because it was "repugnant to their moral, religious, and political beliefs." *Id.* at 707. The husband had suffered criminal penalties for covering up the motto, and the wife was equally as susceptible to state prosecution. *Id.* at 708, 710.

The Court recognized that First Amendment protection "against state action includes both the right to speak freely and the right to refrain from speaking at all." *Id.* at 714. New Hampshire's measure forced "an individual, as part of his daily life . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715. Requiring the plaintiffs to use their personal property as a "mobile billboard for the State's ideological message or suffer a [criminal] penalty" implicated First Amendment protections and could be justified only by a "sufficiently compelling" state interest. *Id.* at 715-16 (quotations omitted). The Court determined that New Hampshire's interest in requiring drivers to display the state motto was not sufficiently compelling. *Id.* at 716-17.

Thus, in *Barnette* and *Wooley*, the Court "invalidated [the] outright compulsion of speech." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005). The Court has extended the "reasoning of these compelled-speech cases . . . to certain instances in which individuals are compelled not to speak, but to subsidize a private message with which they disagree." *Id.; see, e.g., United Foods*, 533 U.S. at 410 (noting that the First Amendment prohibits "compelling certain individuals to pay subsidies for speech to which they object"). It

43

also has invoked *Barnette* and *Wooley* to strike down content-based government disclosure requirements that burden a plaintiff's free speech rights. *See Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 797-98 (1988) (holding it unconstitutional for the state to require professional fundraisers to disclose certain factual information to potential donors before soliciting funds). This is because the "general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573.

Although the *Wooley* Court described the "Live Free or Die" license plate motto as conveying an "ideological message," the Supreme Court's case law suggests that ideological speech is not the only form of forbidden compelled speech. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("[C]ompelled statements of fact . . ., like compelled statements of opinion, are subject to First Amendment scrutiny."); *United Foods*, 533 U.S. at 413 (stating that speech "need not be characterized as political before it receives First Amendment protection"); *Hurley*, 515 U.S. at 573 (explaining that the compelled speech doctrine applies "to statements of fact the speaker would rather avoid"); *Riley*, 487 U.S. at 797-98 (1988) (stating that, like compelled statements of opinion, compelled statements of fact burden protected speech).  Circuit Courts have also reached this conclusion.  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1281-1283 (10th Cir. 2004) (""First Amendment protection does not hinge on the ideological nature of the speech involved." Thus, "being forced to speak rather than to remain silent"—"occurs regardless of whether the speech is ideological.").

### 3.   Forum analysis

The forum analysis also has bearing in this matter.  While the outside of the Capitol has long been established to be a public forum, entitled to robust protection, *Capitol Square Review*

*& Advisory Bd. v. Pinette*, 515 U.S. 753 (1995), obviously the inside, and particularly the Hall of

the House is a different matter.  It appears clear that the Hall of the House, limited to

congressional speakers only, and perhaps limited at times to the matters that are discussed and

debated there, is a limited public forum.  *Pleasant Grove City v. Summum*, 555 U.S. 460, 469

(2009).  This is because it is "limited to use by certain groups or dedicated solely to the

discussion of certain subjects."  *Id.* at 470.  Thus, "[i]n such a forum, a governmental entity may

impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.*

As observed, however, when it comes to the symbolic speech at issue, one viewpoint was

favored over another.  And viewpoint discrimination is *ipso facto* unconstitutional in a limited

public forum.  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).

## CONCLUSION

Plaintiffs respectfully request that this Court deny the Defendants' Motion to Dismiss.

Dated: October 29, 2021

Respectfully Submitted,

/s/Christopher Wiest
Christopher Wiest (DCD KY002)
Chris Wiest, Attorney at Law, PLLC
25 Town Center Blvd, Ste. 104
Crestview Hills, KY 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

/s/ Aaron Siri
Aaron Siri (*pro hac*)
Elizabeth A. Brehm (*pro hac vice*)
Jessica Wallace (*pro hac vice*)
SIRI & GLIMSTAD LLP
200 Park Avenue, 17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com

/s/John R. Garza
John R. Garza
Bar ID: 398728
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
Tel: (301) 340-8200 x 100
jgarza@garzanet.com

/s/Thomas Bruns
Thomas Bruns (*pro hac vice*)
Bruns, Connell, Vollmar, Armstrong LLC
4750 Ashwood Drive, Ste. 200
Cincinnati, Ohio 45241
Tel: (513) 312-9890
tbruns@bcvalaw.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing by filing same via the Court's CM/ECF

system, this 29 day of October, 2021, which will serve same upon all Counsel of Record.

/s/Christopher Wiest