## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| HON. THOMAS MASSIE, in his official and individual capacities, <u>et al.</u>, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 21-2023 (RBW) |
| HON. NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiffs, the Honorable Thomas Massie, the Honorable Marjorie Taylor Greene, and the Honorable Ralph Norman, all members of the United States House of Representatives (the "House"), bring this civil action against the defendants, the Honorable Nancy Pelosi, in her official capacity as Speaker of the House; William J. Walker, in his official capacity as the Sergeant-at-Arms of the House; and Catherine Szpindor, in her official capacity as the Chief Administrative Officer of the House.  <u>See</u> Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 5–10, ECF No. 1.  The plaintiffs allege violations of the Twenty-Seventh Amendment to the United States Constitution, <u>see id.</u> ¶¶ 49–54; Article I, Section 5 of the Constitution, <u>see id.</u> ¶¶ 55–59; Article I, Sections 6 and 7 of the Constitution, <u>see id.</u> ¶¶ 60–67; and the First Amendment to the Constitution, <u>see id.</u> ¶¶ 68–75.  Currently pending before the Court is the defendants' motion to dismiss the plaintiffs' Complaint.  <u>See</u> Motion to Dismiss of Defendants Nancy Pelosi, William J. Walker, and Catherine Szpindor ("Defs.' Mot.") at 1, ECF

No. 31.  Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant the defendants' motion and dismiss the plaintiffs' Complaint.

## I.     BACKGROUND

The following allegations are taken from the plaintiffs' Complaint, unless otherwise noted.

## A.     Regulatory Background

On May 15, 2020, in response to the COVID-19 pandemic, the 116th Congress "enacted H[ouse] Res[olution] 965, which, among other things, created a 'covered period,' during which members of Congress could vote by proxy."  Compl. ¶ 15 n.5.  House Resolution 965 stated that

> at any time after the Speaker or the Speaker's designee is notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect, the Speaker or the Speaker's designee, in consultation with the Minority Leader or the Minority Leader's designee, may designate a period (hereinafter in this resolution referred to as a "covered period") during which a Member who is designated by another Member as a proxy . . . may cast the vote of such other Members or record the presence of such other Member in the House.

H.R. Res. 965 § 1(a), 116th Cong. (May 15, 2020), https://www.congress.gov/bill/116th-congress/house-resolution/965/text.  House Resolution 965 further provided that "a covered period shall terminate [forty-five] days after the Speaker or the Speaker's designee designates such period[,]" but that

> [i]f, during a covered period, the Speaker or the Speaker's designee receives further notification from the Sergeant-at-Arms, in consultation with the Attending Physician, that the public health emergency due to a novel coronavirus remains in effect, the Speaker or the Speaker's designee, in consultation with the Minority

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Mem."), ECF No. 31; (2) the Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n"), ECF No. 35; (3) the Reply in Support of Defendants' Motion to Dismiss ("Defs.' Reply"), ECF No. 43; (4) the defendants' Notice of Supplemental Authority ("Defs.' 1st Notice"), ECF No. 45; and (5) the defendants' Notice ("Defs.' 2d Notice"), ECF No. 46.

Leader or the Minority Leader's designee, may extend the covered period for an additional [forty-five] days.

Id. § 1(b)(1).  Since the passage of House Resolution 965 on May 15, 2020, the covered period "has been repeatedly extended by the Speaker[,]" Compl. ¶ 15 n.5,[2] and, on January 4, 2021, House Resolution 965 was incorporated by the 117th Congress in House Resolution 8, see H.R. Res. 8, 117th Cong. (Jan. 4, 2021), https://www.congress.gov/bill/117th-congress/house-resolution/8/text?q=%7B%22search%22%3A%5B%22house+resolution+8%22%2C%22house%22%2C%22resolution%22%2C%228%22%5D%7D&r=3&s=6 (providing that "House Resolution 965, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such resolution applied in the One Hundred Sixteenth Congress" with minor changes); Compl. ¶ 15 n.5 (alleging that, "[o]n or about January 4, 2021, the House . . . , in the 117th Congress, enacted H[ouse] Res[olution] 8, which, among other things, incorporated the 2020 H[ouse] Res[olution] 965 with certain changes not material to this matter").

---

[2] The plaintiffs' Complaint includes allegations regarding the Speaker's actions in extending the covered period. See Compl. ¶ 15 n.5.  To the extent that these allegations challenge the Speaker's authority to extend the covered period, the Court concludes that the Speaker is entitled to Speech or Debate Clause immunity for her extensions of the covered period.  In McCarthy v. Pelosi, the Circuit held that the Speaker's designation of a covered period is protected by the Speech or Debate Clause.  See 5 F.4th 34, 41 (D.C. Cir. 2021), cert. denied, 142 S.Ct. 897 (2022) (concluding that "conduct implementing the [ ] resolution [establishing internal rules for proxy voting] . . . is itself a legislative act" and "falls comfortably within the immunity afforded by the Speech or Debate Clause").  The Speaker's extension of the covered period is triggered by the same mechanism as the initial designation of a covered period.  Compare H.R. Res. 965 § 1(a) (stating that the Speaker may designate a covered period "at any time after the Speaker or the Speaker's designee is notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect"), with id. § 1(b)(1)–(2) (stating that the Speaker may extend a covered period if she "receives further notification from the Sergeant-at-Arms, in consultation with the Attending Physician, that the public health emergency due to a novel coronavirus remains in effect").  And, like the initial designation of a covered period, the extension of a covered period concerns the "implementation of proxy voting[,]" McCarthy, 5 F.4th at 39.  Therefore, in light of the Circuit's holding in McCarthy that the designation of a covered period is a legislative act, see id., and the fact that the plaintiffs make no argument as to why the extension of the covered period is not controlled by McCarthy, see generally Pls.' Opp'n, the Court concludes that the Speaker's extension of the covered period for proxy voting is a legislative act entitled to Speech or Debate Clause immunity.

### 1.  The House's Mask Policy

On January 4, 2021, the Speaker announced the following policies regarding "conduct during a covered period" ("the House's mask policy"):

> [u]nder clause 2 of rule I, the Chair is required to preserve order and decorum in the [House] Chamber.[3]  This includes the responsibility to ensure the protection of Member and staff safety and health during proceedings.  This responsibility is of paramount importance, particularly in the midst of a pandemic.  As such, the Chair wishes to stress the importance of safe practices.  Members and staff will be required to wear masks at all times in the [House Chamber] without exception, including while Members are under recognition.  Members will not be recognized unless they are wearing a mask, and recognition will be withdrawn if they remove their mask while speaking.  The Chair expects all Members and staff to adhere to this requirement as a sign of respect for the health, safety, and well-being of others present in the Chamber and surrounding areas.  Members and staff will not be permitted to enter the [House Chamber] without wearing a mask.  Masks will be available at the entry points for any Member who forgets to bring one.  The Chair views the failure to wear a mask as a serious breach of decorum.  The Sergeant-at-Arms is directed to enforce this policy.  Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes.  Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby.  The Chair will continue the practice of providing small groups of Members with a minimum of [five] minutes within which to cast their votes.  Members are encouraged to vote with their previously assigned group.  After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote.  It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity is maintained in the Chamber at all times.  To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing.  All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

3 The parties refer interchangeably to the "House Chamber" and the "Hall of the House."  Compare Compl. ¶ 14 (referring to the "Hall of the House"), with id. ¶ 57 (referring to the "House Chamber"); Defs.' Mem. at 16 (referring to the "Hall of the House"), with Defs.' Reply at 16 (referring to the "House Chamber").  Because the two terms refer to the same room, see House Chamber, Architect of the Capitol, https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/house-wing/house-chamber (last visited Mar. 9, 2022) ("The House Chamber, also known as the 'Hall of the House of Representatives,' is a large assembly room located in the center of the U.S. Capitol's south wing."), the Court will refer to the room as the "House Chamber."

167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore),

https://www.congress.gov/congressional-record/2021/1/4/house-section/article/H38-7; see

Compl. ¶ 17 & n.9.

### 2.   House Resolution 38

On January 12, 2021, the House "enacted H[ouse] Res[olution] 38[,]" Compl. ¶ 15,

which stated, inter alia:

> SEC. 4. (a) During a covered period designated pursuant to section 3(s) of House
> Resolution 8—
>
> > (1) the Sergeant-at-Arms is authorized and directed to impose a fine
> > against a Member, Delegate, or the Resident Commissioner for the failure
> > to wear a mask in contravention of the Speaker's announced policies of
> > January 4, 2021[.]

H.R. Res. 38 § 4(a)(1), 117th Cong. (Jan. 12, 2021), https://www.congress.gov/117/bills/

hres38/BILLS-117hres38eh.pdf.

Fines imposed pursuant to House Resolution 38 are "treated as though imposed under

clause 3(g) of rule II," id. § 4(a)(2), which "authorize[s] and direct[s the Sergeant-at-Arms] to

impose a fine against a Member, Delegate, or the Resident Commissioner for the use of an

electronic device for still photography or for audio or visual recording or broadcasting in

contravention of" the relevant rules and policies, H.R. Rule II, cl. 3(g)(1),

https://rules.house.gov/sites/democrats.rules.house.gov/files/117-House-Rules-Clerk.pdf; see

Compl. ¶ 15 n.6.  Fines imposed under clause 3(g) of Rule II amount to "$500 for a first offense

and $2,500 for any subsequent offense[,]" H.R. Rule II, cl. 3(g)(2), and may only be imposed

subject to the following three procedures, see id. cl. 3(g)(3).  First, "[t]he Sergeant-at-Arms shall

promptly notify the Member, Delegate, or the Resident Commissioner[;] the Speaker[;] the Chief

Administrative Officer[;] and the Committee on Ethics of any such fine."  Id. cl. 3(g)(3)(A).

Second, the "Member, Delegate, or Resident Commissioner may appeal the fine in writing to the

Committee on Ethics[,] not later than [thirty] calendar days or five legislative days, whichever is later, after notification[.]" Id. cl. 3(g)(3)(B).  In the event that the Member, Delegate, or Resident Commissioner submits such an appeal, "the Committee on Ethics shall have [thirty] calendar days or five legislative days, whichever is later, to either dismiss the fine or allow it to proceed[,]" id. cl. 3(g)(C), however, pursuant to House Resolution 38, all of these "time periods . . . [do] not commence until the Committee on Ethics has adopted written rules, and the chair of the Committee on Ethics [has] notif[ied] all Members, Delegates, or the Resident Commissioner with pending appeals upon such commencement[,]" H.R. Res. 38 § 4(a)(2)(A). Moreover, "fine[s] subject to appeal under clause 3(g)(3) of [R]ule II shall proceed unless dismissed within the time period provided under clause 3(g)(3)(C) of [R]ule II." Id. § 4(a)(2)(B). Third and finally, "[u]pon a determination regarding the appeal or if no appeal has been filed at the expiration of the [relevant] period . . . , the chair of the Committee on Ethics shall promptly notify the Member, Delegate, or the Resident Commissioner[;] the Speaker[;] and the Chief Administrative Officer[,]" and the "Speaker shall promptly lay such notification before the House." H.R. Rule II, cl. 3(g)(C).

House Resolution 38 further provides that fines "shall be administered as though pursuant to clause 4(d) of [R]ule II[.]" H.R. Res. 38 § 4(a)(2).  Under clause 4(d) of Rule II, "[u]pon notification from the chair of the Committee on Ethics pursuant to clause 3(g)(3)(c)[ of Rule II], the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner." H.R. Rule II, cl. 4(d)(1); see Compl. ¶ 16.

Additionally, House Resolution 38 provides that the authorization to impose a fine for failure to comply with the House's mask policy "establishes a standard of conduct within the

meaning of clause 3(a)(2) of [R]ule XI."  H.R. Res. 38 § 4(b).  Clause 3(a)(2) of Rule XI

authorizes the Committee on Ethics to

> investigate, subject to [the limitations set forth in] paragraph (b)[, which proscribe "resolution[s], report[s], recommendation[s], [investigations,] or advisory opinion[s] relating to the official conduct of a Member, Delegate, Resident Commissioner, officer, or employee of the House" except in certain circumstances], an alleged violation by a Member, Delegate, Resident Commissioner, officer, or employee of the House of the Code of Official Conduct or of a law, rule, regulation, or other standard of conduct of such Member, Delegate, Resident Commissioner, officer, or employee in the performance of the duties or the discharge of the responsibilities of such individual.

H.R. Rule XI, cl. 3(a)(2).

### 3.  Subsequent Amendments of the House's Mask Policy

On May 11, 2021, the Speaker announced a modification of the House's mask policy, see

Compl. ¶ 23, which stated that "while masks continue[d] to be required in the Hall of the House,

Members [we]re permitted to remove their masks temporarily while under recognition."  167

Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker),

https://www.congress.gov/congressional-record/2021/5/11/house-section/article/H2157-6; see

Compl. ¶ 23 ("On or about May 11, 2021, the Speaker unilaterally purported to grant exceptions

to the mask mandate for members under recognition[.]" (footnote omitted)).  "This

announcement [wa]s incorporated within the policy on conduct during a covered period of

January 4, 2021[, i.e., the House's mask policy,] and the Sergeant-at-Arms [wa]s directed to

enforce mask requirements consistent with this announcement."  167 Cong. Rec. H2157 (daily

ed. May 11, 2021) (announcement by the Speaker).

Subsequently, on June 11, 2021, the Speaker announced a further modification to the

House's mask policy, which established "exceptions to the mask mandate for [Members who

are] vaccinated[ against the COVID-19 virus]."  Compl. ¶ 23; see 167 Cong. Rec. H2715 (daily

ed. June 14, 2021) (announcement by the Speaker), https://www.govinfo.gov/content/pkg/

CREC-2021-06-14/pdf/CREC-2021-06-14-house.pdf (announcing on June 14, 2021, that, "[c]onsistent with updated guidance from the Attending Physician, . . . masks are no longer required in the Hall of the House for Members and staff who have been fully vaccinated" and that "[t]his announcement is incorporated within the policy on conduct during a covered period of January 4, 2021").  According to the plaintiffs, the June 11, 2021 modification to the House's mask policy "was transparently reactive to [the p]laintiffs['] and other minority members' position that vaccination status is private medical information that should not need to be shared with the government" because it "came after [the] Speaker [ ] had faced substantial opposition from the House Minority Leader Kevin McCarthy and several other Republican lawmakers over the House masking rules."  Compl. ¶ 38.

## B.    Factual Background

The plaintiffs allege that, "[o]n May 18, [2021,] and again on May 19, 2021," they "entered the House [Chamber] to vote without wearing masks[,]" id. ¶ 26, in order to "engage in symbolic protest speech[,]" id. ¶ 27.  Specifically, the plaintiffs represent that they wanted to (1) engage in a "protest against the double standard being enforced by [the d]efendants[,]" id.; (2) demonstrate "the well-founded beliefs shared by [the p]laintiffs that mask[-]wearing is not scientifically based," "mask[-]wearing is not necessary for the vaccinated or naturally immune," "mask[-]wearing is merely political theater," "one's bodily integrity should be free from government control," "individuals should have the liberty to choose what they wear on their face," and "individuals should be free to make their own medical decisions[,]" id.; and (3) "highlight recent scientific findings that the use of face coverings has no appreciable effect

on slowing or halting the spread of COVID-19[,]" id.[4]  Although the plaintiffs acknowledge that

they were not complying with the House's mask policy, they contend that their "activities did not

disrupt, delay, or otherwise interfere in any way with House proceedings[,]" which "did not halt

or stop at any time as a result of [the p]laintiffs' actions[,]" and "the presiding officer [did not]

delay the proceedings to address the lack of face coverings by [the p]laintiffs."  Id. ¶ 30.

Moreover, they note that, had the June 11, 2021 amendment to the House's mask policy,

permitting vaccinated Members to remove their masks, see 167 Cong. Rec. H2715 (daily ed.

June 14, 2021) (announcement by the Speaker), been in effect when the plaintiffs appeared in the

House Chamber without masks on May 18, 2021, and May 19, 2021, plaintiff Representative

Norman would have been in compliance, since he "had already received the vaccine for COVID-

19 when he appeared on the floor of the House in May without a mask[.]"  Id. ¶ 41.  However,

because the Speaker did not announce the modification to the House's mask policy that

permitted vaccinated Members to remove their masks until June 11, 2021, see id. ¶ 37, plaintiff

Representative Norman was still "issu[ed] the fine" for his failure to wear a mask on May 18,

2021, and May 19, 2021, id. ¶ 41.

Following the plaintiffs' actions on May 18, 2021, and May 19, 2021, "[d]efendant

Walker sent correspondence to each of the [p]laintiffs imposing a fine against each [p]laintiff in

the amount of $500, which[,] according to H[ouse] Res[olution] 38[,] would be deducted from

[that p]laintiff's compensation through procedures overseen by [d]efendant Szpindor."  Id. ¶ 31.

The "[p]laintiffs appealed these fines to the House Ethics Committee, but in votes split between

---

[4] Specifically, the plaintiffs cite sources stating that "respiratory fluids [released] during exhalation . . . carry virus
and transmit infection" and "[t]he smallest very fine droplets . . . are small enough that they can remain suspended in
the air for minutes to hours[;]" "[e]ven when an infectious person is more than [six] feet away, aerosols have the
ability to travel and infect others[;]" and "[a]lthough surgical mask[s, one type of mask,] may be adequate to remove
bacteria exhaled or expelled by health[-]care workers, they may not be sufficient to remove [ ] submicrometer-size
aerosols containing pathogens."  Compl. ¶ 27.

[Members of the Committee who are] Democrats and [Members of the Committee who are]

Republicans, the Committee denied each appeal." Id. ¶ 32.

"On July 22, 2021, [plaintiff Representative] Massie received a <u>Deduction of Fine</u>

<u>Imposed Pursuant to House Resolution 38</u> memorandum, which read in relevant part:

> [t]he Office of Members' Services received correspondence on July 20, 2021, from the House Committee on Ethics upholding a fine imposed pursuant to House Resolution 38 and House Rule II, clause 3(g).  The fine was imposed by the House Sergeant[-]at[-]Arms on May 19, 2021.  The Chief Administrative Officer is responsible for deducting the amount of any fine levied under House Resolution 38 and House Rule II, clause 3(g) from the net salary otherwise due the Member, Delegate, or Resident Commissioner.  I am including a copy of the Committee on Ethics and Sergeant[-]at[-]Arms notices for your records.
>
> The full amount of the fine, $500.00, will be deducted from your July 2021 payroll (to be disbursed August 1).

Id. ¶ 44; see generally id., Exhibit ("Ex.") A (Letter from Deborah Ellis-Jones, Manager, CAO

Members' Servs., to the Hon. Thomas Massie, Member of Congress (July 22, 2021) ("Fine

Notice")) at 1.  The other "[p]laintiffs [each] received correspondence materially similar" to the

memorandum received by plaintiff Representative Massie.  Id. ¶ 45.

On May 18, 2021, the same day that the plaintiffs initially appeared in the House

Chamber without masks, "the Speaker herself also appeared on the House floor without a

mask . . . while under recognition to speak in the [C]hamber[.]"  Id. ¶ 33.  "Defendant Walker

took no actions to fine Speaker Pelosi despite her violation of the exact same rule—H[ouse]

Res[olution] 38—as [the p]laintiffs violated on the very same day[,]" id. ¶ 34, because of the

May 11, 2021 modification of the House's mask policy enabling Members to remove their masks

"while under recognition to speak in the [C]hamber," id. ¶ 33.  Similarly, "on June 8, 2021,

Representative Jamie Raskin, a Democrat, also appeared on the House floor without a face

covering," id. ¶ 35, while under recognition to speak, and "[d]efendant Walker took no actions to

fine Representative Raskin[,]" id. ¶ 36.  Following the May 11, 2021 modification of the House's

mask policy, "numerous members of the majority party [ ] failed to wear masks while on the

floor of the House[;]" however, "none of them [were] cited or fined[,]" id. ¶ 42, because they

were "recognized to speak," id. ¶ 43.  According to the plaintiffs, "H[ouse] Res[olution] 8 and

H[ouse] Res[olution] 38 have been weaponized on a partisan basis to punish political opponents,

based on their viewpoints, and all in an effort to force the minority party to conform to the

majority's political views."[5]  Id.

## C.    Procedural Background

On July 27, 2021, the plaintiffs filed their Complaint, see id. at 23, alleging constitutional

violations of the Twenty-Seventh Amendment, see id. ¶¶ 49–54; Article I, Section 5, see id.

¶¶ 55–59; Article I, Sections 6 and 7, see id. ¶¶ 60–67; and the First Amendment, see id. ¶¶ 68–

75.  In response, on September 28, 2021, the defendants filed their motion to dismiss, see Defs.'

Mot. at 2; on November 12, 2021, the plaintiffs filed their opposition; see Pls.' Opp'n at 1; and

on November 16, 2021, the defendants filed their reply, see Defs.' Reply at 1.  On December 2,

2021, the Court held oral argument on the defendants' motion, see Min. Entry (Dec. 2, 2021),

and took the motion under advisement.

---

[5] On March 8, 2022, the defendants filed a notice, representing that, "on February 28, 2022, the Speaker of the House pro tempore announced" that,

> [c]onsistent with updated guidance from the Attending Physician, the Chair wishes to inform Members that masks are no longer required in the Hall of the House.  The Chair would further note that all Members and staff may continue to wear masks at their discretion.  This announcement is incorporated within the policy on conduct during a covered period of January 4, 2021, and supersedes all other announced policies that are in conflict.

Defs.' 2d Notice at 1 (quoting 168 Cong. Rec. H1151 (daily ed. Feb. 28, 2022)).  According to the defendants, "[t]his announcement does not affect fines previously assessed to any Members for violations of the [version of] the [House's] mask policy [ ] in effect[ at the time the fines were issued]."  Id.

## II.      STANDARD OF REVIEW

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life

Ins. Co. of Am., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of

Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's

jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.)

(quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to

dismiss a claim if it "lack[s] . . . subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because

"[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen,

511 U.S. at 377, the plaintiff bears the burden of establishing that the Court has subject-matter

jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

"In deciding a [Rule] 12(b)(1) motion, the [C]ourt need not limit itself to the allegations

of the complaint."  Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9,

14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings as it

deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."

Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Jerome

Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Additionally, the Court must "assume the truth of all material factual allegations in the complaint

and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can

be derived from the facts alleged[.]'"  Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d

1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).

However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in

resolving a [Rule] 12(b)(1) motion than in resolving a [Rule] 12(b)(6) motion for failure to state

a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (first and second alterations in original)

(internal quotation marks omitted).

### III.    ANALYSIS

The defendants move to dismiss the plaintiffs' Complaint, arguing that (1) the

"[p]laintiffs' suit is barred by the Constitution's Speech or Debate Clause[,]" Defs.' Mem. at 11;

and (2) the plaintiffs fail to state a claim upon which relief can be granted, see id. at 15–30.  In

response, the plaintiffs argue that (1) "the challenged conduct is not a speech or debate

function[,]" Pls.' Opp'n at 4, and (2) they "have stated claims upon which relief can be

granted[,]" id. at 18 (capitalization omitted).  Because "a court must first establish as an

antecedent matter that it has jurisdiction[,]" Kaplan v. Cent. Bank of the Islamic Republic of

Iran, 896 F.3d 501, 510 (D.C. Cir. 2018), the Court begins its analysis by addressing the

jurisdictional question—namely, whether the defendants are entitled to immunity under the

Speech or Debate Clause.  For the following reasons, the Court concludes that the defendants are

entitled to immunity under the Speech or Debate Clause.[6]

Pursuant to the Speech or Debate Clause, "Senators and Representatives . . . for any

Speech or Debate in either House . . . shall not be questioned in any other Place."  U.S. Const.

art. I, § 6, cl. 1.  The Clause "provides absolute immunity from civil suit[,]" Rangel v. Boehner,

785 F.3d 19, 23 (D.C. Cir. 2015), for any "conduct [that] is an integral 'part of . . . the due

functioning of the [legislative] process[,]'" Fields v. Off. of Eddie Bernice Johnson,

---

[6] Because the Court concludes that it lacks subject-matter jurisdiction over the plaintiffs' Complaint because the defendants are entitled to immunity under the Speech or Debate Clause, the Court need not address the parties' arguments regarding whether the plaintiffs have adequately stated a claim under Rule 12(b)(6).  See McCarthy, 5 F.4th at 38 (noting that the Speech or Debate Clause "state[s a] jurisdictional objection[]"); Passut v. Cardona, 540 F. Supp. 3d 27, 35 (D.D.C. 2021) (Walton, J.) (noting that "the Court is obligated to dismiss a claim if it 'lack[s] [ ] subject[-]matter jurisdiction" (alterations in original)).

459 F.3d 1, 9 (D.C. Cir. 2006) (quoting United States v. Brewster, 408 U.S. 501, 526 (1972)) (first alteration added).

"The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes[,]" id. (quoting Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 501 (1975)), and thus, "although the Clause speaks of 'Speech or Debate,' it extends further to all 'legislative acts[,]'" id. (quoting Doe v. McMillan, 412 U.S. 306, 312 (1973)).  See also Gravel v. United States, 408 U.S. 606, 618 (1972) (noting that to "confine the protections of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view"). Consequently, "[t]he 'key consideration . . . is the act presented for examination, not the actor[,]'" McCarthy v. Pelosi, 5 F.4th 34, 39 (D.C. Cir. 2021), cert. denied, 142 S.Ct. 897 (2022) (quoting Walker v. Jones, 733 F.2d 923, 929 (D.C. Cir. 1984)), and "[t]he Clause applies to aides and staff 'insofar as [their] conduct . . . would be a protected legislative act if performed by [a] Member[,]'" id. (quoting Gravel, 408 U.S. at 618) (all but the first alteration in original).

Legislative acts include not only "core legislative acts[, e.g.,] 'how [a Member] spoke, how he [or she] debated, how he [or she] voted, or anything he [or she] did in the chamber or in committee[,]'" Fields, 459 F.3d at 9 (quoting Brewster, 408 U.S. at 526) (second alteration in original), but also acts that fall into at least one of the two categories identified by the Supreme Court in Gravel v. United States: (1) "matters pertaining 'to the consideration and passage or rejection of proposed legislation,' and [(2)] 'other matters which the Constitution places within the jurisdiction of either House[,]'" McCarthy, 5 F.4th at 40 (quoting Gravel, 408 U.S. at 625). However, legislative acts must be an "integral part[ of these matters,]" Gravel, 408 U.S. at 625 (emphasis added), rather than merely having "some nexus to legislative functions,'" Fields, 459 F.3d at 10 (quoting Brewster, 408 U.S. at 528) (emphasis in original), or being "merely 'related

to,' as opposed to 'part of,' the 'due functioning' of the 'legislative process,'" id. (quoting Brewster, 408 U.S. at 514).

The defendants argue that the "[p]laintiffs' suit is barred by the [ ] Speech or Debate Clause" because "[t]he Clause provides absolute immunity from civil suit for Members of Congress, Officers, and their aides for all 'legislative acts'—a term that the [District of Columbia] Circuit has broadly construed to include execution and implementation of the House's internal rules."  Defs.' Mem. at 11 (citing McCarthy, 5 F.4th at 38–40; Consumers Union of U.S. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1351 (D.C. Cir. 1975)).  In response, the plaintiffs argue that "the congressional staff functions at issue . . . are purely administrative in nature and not within the Speech or Debate Clause's ambit."  Pls.' Opp'n at 4.  For the following reasons, the Court concludes that the defendants' actions "are quintessentially legislative acts falling squarely within the Clause's ambit[,]" McCarthy, 5 F.4th at 39, because they fall under both Gravel categories: (1) they regulate Members' conduct in the House Chamber as Members participate in the "consideration and passage or rejection of proposed legislation[,]" and (2) they fall within the House's authority to enact rules regarding its legislative process and to discipline Members for non-compliance, which are "matters which the Constitution places within the jurisdiction of [the] House[,]" Gravel, 408 U.S. at 625.

A.     **The First Gravel Category**

The Court begins by considering whether the defendants' actions fall within the first category of legislative acts recognized in Gravel, namely, whether the defendants' actions are "an integral part of the deliberative and communicative processes by which Members participate in committee or House proceedings with respect to the consideration and passage or rejection of proposed legislation[.]"  See Gravel, 408 U.S. at 625.  The defendants argue that their actions are

"an integral part of the [House's] deliberative and communicative processes[,]" id., because they concern "an internal rule designed to protect the health of all persons in the [House Chamber], where all House-wide debate and voting on legislation occurs," Defs.' Mem. at 15.  In response, the plaintiffs argue that the "administrative functions of mask enforcement and payroll deductions" do not "constitute 'legislative acts.'"  Pls.' Opp'n at 10.  For the following reasons, the Court agrees with the defendants that their actions fall within Gravel's first category.

To start, the Court considers the nature of the actions taken by the defendants.  See McCarthy, 5 F.4th at 39 ("The 'key consideration . . . is the act presented for examination[.]'" (quoting Walker, 733 F.2d at 929)).  The plaintiffs' Complaint challenges the actions taken by the Speaker,[7] the Sergeant-at-Arms, and the Chief Administrative Officer in the enforcement of

---

[7] In their Complaint, the plaintiffs clarify that the Speaker "is sued in her official capacity only, and only to the extent that she is performing administrative and oversight duties of the other two [d]efendants, [ ] Walker and [ ] Szpindor[.]"  Compl. ¶ 8.  In their opposition, the plaintiffs elaborate further, arguing that the Speaker

> is a proper [d]efendant [so long as]: (a) she is not sued in connection with the enactment or passage of any challenged legislation itself (and she is not); (b) she is not questioned in connection with such enactment or passage of legislation (and she will not be); but rather (c) she is sued solely in connection with administrative directives she gave to [defendants] Walker or Szpindor to engage in enforcement of mandates outside of official directives from the floor (which is the scope of her involvement in this matter).

Pls.' Opp'n at 18.  Consistent with their position, according to the plaintiffs, the scope of their suit against the Speaker is limited to "administrative directives" issued by the Speaker that were not "official directives from the floor[.]"  Id.; see Compl. ¶ 8 (alleging that the Speaker "is not sued [ ] for her legislative acts, including for statements made on the House floor").

Despite this purported clarification, the plaintiffs' Complaint contains no allegations that the Speaker issued any "administrative directives" that were not "official directives from the floor[,]" Pls.' Opp'n at 18, or performed any "administrative and oversight duties[,]" Compl. ¶ 8, regarding defendants Walker and Szpindor in their execution of fines pursuant to House Resolution 38.  Instead, the only actions taken by the Speaker set forth in the Complaint are directives issued from the House floor, i.e., (1) extensions of the forty-five-day "covered period[,]" id. at 5 n.5; see, e.g., 166 Cong. Rec. H9169 (daily ed. Dec. 31, 2020) (announcement by the speaker) (extending the covered period as of December 31, 2020); 167 Cong. Rec. H1711 (daily ed. Apr. 5, 2021) (announcement by the speaker pro tempore) (extending the covered period as of April 5, 2021); 167 Cong. Rec. H2404 (daily ed. May 17, 2021) (announcement by the speaker pro tempore) (extending the covered period as of May 20, 2021); (2) announcement of the House's mask policy on January 4, 2021, from the House floor, see Compl. ¶ 17 & n.9; see also 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); and (3) announcement of the amendments to the House's mask policy on May 11, 2021, and June 11, 2021, from the House floor, see Compl. ¶¶ 23–24, 33, 37, 38, 40, 43, 70; see also 167 Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker) (May 11, 2021 amendment to the House's mask policy); 167 Cong. Rec. H2715 (daily ed. June 14, 2021)

(continued . . .)

the House's mask policy and the issuance of fines for violations of that policy pursuant to House Resolution 38.  See Compl. ¶ 75 (stating that the plaintiffs seek "a declaratory judgment that the House . . . may not impose or collect fines" and "an injunction against [d]efendants Walker and Szpindor from imposing or collecting fines by reducing Congressional salaries").  The House's mask policy sets forth the circumstances requiring Members and staff to wear masks in the House Chamber.  See id. ¶ 17 (as of January 4, 2021, requiring that "Members and staff . . . wear masks at all times in the [House Chamber]"); id. ¶ 23 (as of May 11, 2021, "grant[ing] exceptions to the [House's] mask [policy] for members under recognition"); id. (as of June 11, 2021, "grant[ing] exceptions to the [House's] mask [policy] for [Members and staff who are fully] vaccinated"). This policy stems from the Speaker's obligation to "preserve order and decorum in the Chamber" pursuant to "clause 2 of [House R]ule I[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); see Compl. ¶ 17 & n.9.  In furtherance of this policy, the House passed House Resolution 38, which "authorize[s] and direct[s the] impos[ition of] a fine . . . for the failure to wear a mask in contravention of the" House's mask policy.  H.R. Res. 38 § 4(a)(1); see Compl. ¶ 15.  And, as a result of the House's mask policy and House Resolution 38, defendant Walker issued notices of fines to the plaintiffs and, following the plaintiffs' appeals to the House Committee on Ethics, defendant Szpindor deducted the amount of the fines from the plaintiffs' paychecks.  See Compl. ¶¶ 31, 44–45.

---

(. . . continued)

(announcement by the Speaker) (June 11, 2021 amendment to the House's mask policy).  Although the plaintiffs allege that the amendments to the House's mask policy were "not from any statements on the House floor[,]" Compl. ¶ 24, "[w]here, as here, a complaint's factual allegations are contradicted by exhibits of which the Court may take judicial notice, the Court need no longer accept as true [a] plaintiff's version of events[,]" Lewis v. District of Columbia, 195 F. Supp. 3d 53, 60 (D.D.C. 2016) (Walton, J.).  Therefore, despite the plaintiffs' statements in their Complaint and opposition to the defendants' motion to dismiss that the Speaker "is not sued . . . for statements made on the House floor[,]" Compl. ¶ 8, or for "official directives from the floor[,]" Pls.' Opp'n at 18, those actions are the only ones alleged to have been taken by the Speaker.  Accordingly, the Court will consider whether the Speaker is entitled to immunity under the Speech or Debate Clause for announcing the House's mask policy and subsequent amendments to that policy together with the actions of Walker and Szpindor in imposing fines on the plaintiffs.

In accordance with the Circuit's decision in <u>McCarthy v. Pelosi</u>, the Court concludes that the defendants' actions are part of the process of enabling the legislative processes in the House Chamber to occur.  In <u>McCarthy</u>, the Circuit concluded that several administrative steps incident to proxy voting were legislative acts because they were part of the "rules governing how Members can cast their votes on legislation and mark their presence for purposes of establishing a legislative quorum."  5 F.4th at 37.  Viewed independently, the administrative steps in <u>McCarthy</u>—which included notification of "the existence of a public health emergency due to COVID-19[,]" "designat[ion of] a covered period[,]" "accept[ance of] proxy letters from Members and maintain[ance of] a proxy list[,]" <u>id.</u> at 39—may not be "integral parts of the deliberative and communicative processes by which Members participate in committee and House proceedings[,]" <u>Gravel</u>, 408 U.S. at 625.  However, when considered as components of the scheme that enabled Members to cast votes—<u>i.e.</u>, as part of the "administration of voting by Members[,]" <u>McCarthy</u>, 5 F.4th at 40—these actions "concern[ed] core legislative acts[,]" <u>id.</u> at 39.

Along the same lines, in <u>Consumers Union v. Periodical Correspondents' Ass'n</u>, the Circuit concluded that the Periodical Correspondents' Association's regulation of admission to the press galleries located in the House Chamber was a legislative act because it was a "delegated legislative function[]" that was "an integral part of the legislative machinery" and, therefore, an "act[] generally done in relation to the business before Congress."  515 F.2d at 1350.  By managing admission to the press galleries, the Association was "regulati[ng] [ ] the very atmosphere in which lawmaking deliberations occur[ed]."[8]  <u>Walker</u>, 733 F.2d at 930

---

[8] The plaintiffs argue, in a footnote, that "[t]he <u>Consumers Union</u> court rested its decision in part on the undisputed assumption that the [d]efendants there were acting in good faith[,]" Pls.' Opp'n at 12 n.9 (citing <u>Consumers Union</u>, 515 F.2d at 1350), whereas, here, the "[p]laintiffs make no such concession" and instead "contend that H[ouse
(continued . . .)

(discussing Consumers Union).  By adopting and implementing the press gallery rules, lawmakers were regulating their own lawmaking environment, and therefore "the Speech or Debate Clause barred [the court] from hearing the suit."  Barker v. Conroy, 921 F.3d 1118, 1128 (D.C. Cir. 2019) (discussing Consumers Union).

Here, the defendants' actions constitute part of the scheme that regulates "order and decorum in the Chamber[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore), i.e., how Members must act in the House Chamber—the very place where Members engage in the legislative process by introducing, considering, and voting on proposed legislation.  See History, Art & Archives: Tour the House Chamber, U.S. House of Representatives, https://history.house.gov/Education/Capitol-Tour/House-Chamber-Tour/ (last visited Mar. 9, 2022) (noting that, "[a]s the central space for the House, [the House Chamber is] the location where Members introduce, debate, and vote on legislation").  From the House's mask policy through the Chief Administrative Officer's deduction of the fines from the plaintiffs' paychecks, the defendants' actions sought to ensure that Members would comply with the code of conduct set forth in the House's mask policy while Members were engaging in the

---

(. . . continued)

]Res[olution] 38 is not only unlawful, but being implemented in a discriminatory and malign manner intentionally harassing members of the House minority[,]" id. (citing Compl. ¶¶ 31–43).  The plaintiffs are correct that the Consumers Union decision noted the fact that "[i]t [wa]s conceded that [one of the defendants—the Periodical Correspondents' Association—was] acting in good faith[,]" Consumers Union, 515 F.2d at 1350.  However, despite the Consumers Union notation of the Association's good faith, id., ultimately, the only pertinent question before the Circuit in determining whether the Speech or Debate Clause applied was whether the conduct constituted "legislative acts" within the ambit of the Clause, not whether the acts were done in good faith.  See Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 508–09 (1975) ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it.").  As the Supreme Court has observed, immunity under the Speech or Debate Clause is absolute and does not depend on an actor's good faith.  See id. at 503 ("[O]nce it is determined that Members are acting within the legitimate legislative sphere[,] the Speech or Debate Clause is an absolute bar to interference." (internal quotation marks omitted)); Rangel, 785 F.3d at 23 (noting that the Clause "provides absolute immunity from civil suit").  Therefore, the plaintiffs' allegations here that the defendants acted in bad faith have no bearing on the Court's assessment of whether the defendants are entitled to the protection of the Speech or Debate Clause.

legislative process.  Thus, similar to the ways in which the notification of "the existence of a public health emergency due to COVID-19[,]" "designat[ion of] a covered period[,]" "accept[ance of] proxy letters from Members[,] and maintain[ance of] a proxy list[,]" McCarthy, 5 F.4th at 39, served as part of the "administration of voting by Members" in McCarthy, id. at 40–41, the defendants' actions are merely "part and parcel[,]" Gravel, 408 U.S. at 626, of the overall scheme to "preserve order and decorum in the Chamber[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore), when the House conducts its legislative business.  Accordingly, because the defendants' actions "squarely concern 'the direct business of passage or rejection of proposed legislation[,]'" McCarthy, 5 F.4th at 39 (quoting Consumers Union, 515 F.2d at 1351), they fall under Gravel's first category.

The plaintiffs present several arguments in opposition to this conclusion.  First, they argue that the defendants' actions fall within "the vast array of administrative functions performed by the House [that] do not fall within the Speech or Debate Clause[,]" Pls.' Opp'n at 10, analogizing this case to Walker v. Jones, see id. at 9–10.  See id. at 9 (arguing that, "[a]s then-Judge Ginsb[u]rg pointed out in Walker, the argument that every administrative function performed by the House falls within the Speech or Debate Clause is 'far-fetched[]'" (quoting Walker, 733 F.2d at 931)).  In Walker, the Circuit concluded that a complaint of discriminatory termination by the former "general manager of the House . . . Restaurant System" against the "Chairman of the Subcommittee on Services of the House of Representatives Committee on House Administration" and the "Staff Director of the Subcommittee[,]" 733 F.2d at 926, was not barred by the Speech or Debate Clause because the general manager's "job as general manager of food services entailed no function relating to the process of making laws[,]" id. at 930–31.  In

reaching this conclusion, the Circuit distinguished the administrative services provided to

Members from the legislative process, finding that

> [p]ersonnel who attend to food service, medical care, physical fitness needs,
> parking, and haircutting for members of Congress no doubt contribute importantly
> to our legislators' well-being and promote their comfort and convenience in
> carrying out Article I business.  But these staff members, unlike those who help
> prepare for hearings or assist in the composition of legislative measures, cater to
> human needs that are not "intimately cognate," Davis v. Passman, 544 F.2d
> at 879, to the legislative process.

Id. at 931.

In this case, however, the challenged actions are not analogous to "food service, medical

care, physical fitness needs, parking, and haircutting[,]" id.  See Pls.' Opp'n at 9–10.  As the

Circuit noted in Walker, the only link between those functions and the legislative process is the

extent to which they "promote[d legislators'] comfort and convenience in carrying out Article I

business."  Walker, 733 F.2d at 931.  Here, in contrast, the defendants' actions can only be

characterized as "administrative[,]" Pls.' Opp'n at 10, to the extent that they concern the actual

administration of the "legislative process" itself, Walker, 733 F.2d at 931, namely how Members

must conduct themselves while participating in the legislative process in the House Chamber.[9]

Cf. McCarthy, 5 F.4th at 40–41 (concluding that the steps taken to enable proxy voting were part

of the "administration of voting by Members").

Second, the plaintiffs point to the Circuit's decision in Barker v. Conroy, see Pls.' Opp'n

at 12, in which the Circuit concluded that the House Chaplain's "administration of the guest

chaplain program is not an integral part of the House's deliberative and communicative

---

[9] Certainly, the House's administration of the payroll process in general for Members and other staff may be the type
of "administrative function" that is more similar to "food service, medical care, physical fitness needs, parking, and
haircutting for members of Congress[.]"  See Walker, 733 F.2d at 931.  However, the plaintiffs challenge the payroll
process only to the extent that fines are deducted from their paycheck as part of the enforcement of the House's
mask policy.  See Compl. ¶ 59 (asserting that the plaintiffs seek, inter alia, "a declaratory judgment that the
House . . . may not impose or collect fines for the failure to wear a mask" (emphasis added)).  Therefore, the
House's pure administration of its payroll system in general is not at issue in this case.

processes[,]" <u>Barker</u>, 921 F.3d at 1128 (internal quotation marks omitted).  The plaintiffs argue

that, "[j]ust as a chaplain's prayer prior to House deliberations does not 'regulate the very

atmosphere in which lawmaking deliberations occur' and 'poses no threat to the integrity of the

legislative process,' neither does enforcing mask wearing or the administration of payroll

deductions."  Pls.' Opp'n at 12 (quoting <u>Barker</u>, 921 F.3d at 1128).  In <u>Barker</u>, the Circuit

considered whether the House Chaplain was entitled to immunity under the Speech or Debate

Clause for his rejection of an application by a "self-professed atheist" to deliver the House's

opening prayer as a "guest chaplain[.]"  921 F.3d at 1121–22.  Concluding that the House

Chaplain's rejection of the application was not a "legislative act[,]" the Circuit distinguished its

earlier decision in <u>Consumers Union</u> because "any rules pertaining to the opening prayer—an

event that occurs at the very beginning of the legislative session before any deliberating

whatsoever—could not similarly be said to regulate 'the very atmosphere in which lawmaking

deliberations occur.'"  <u>Id.</u> at 1128 (quoting <u>Walker</u>, 733 F.2d at 930).

       Here, however, as in <u>Consumers Union</u>, there is no question that the defendants' actions

"regulate 'the very atmosphere in which lawmaking deliberations occur.'"  <u>Id.</u> (quoting <u>Walker</u>,

733 F.2d at 930).  As the Court noted above, the defendants' actions are part of the scheme that

regulates Members' behavior as they engage in "lawmaking deliberations[,]" <u>id.</u>, as well as other

quintessentially legislative activities such as voting.  Therefore, unlike in <u>Barker</u>, which noted

that "[t]he Supreme Court itself has described legislative prayer not as a part of the legislative

process, but rather as a 'symbolic expression' that simply 'lends gravity to public business,

reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a

common aspiration to a just and peaceful society[,]'" <u>id.</u>, the defendants' actions are not so

plainly divorced from the legislative process.  Furthermore, unlike in <u>Barker</u>, which concluded

that "opening prayer" is "an event that occurs at the very beginning of the legislative session before any deliberating whatsoever[,]" id., there is no clear temporal distinction between the behavior for which the plaintiffs were fined and lawmaking deliberations.  See Compl. ¶ 26 (noting that the "[p]laintiffs entered the House floor to vote without wearing masks[,]" along with a photograph taken from C-SPAN television coverage, depicting the House in session while the plaintiffs posed for a photograph without wearing masks).

Third, the plaintiffs argue that Consumers Union is distinguishable because that case implicated concerns about lawmakers' independence from the press, whereas this case implicates the plaintiffs' independence from the majority party in the House.  See Pls.' Opp'n at 11–12 (arguing that "no such consideration of lawmakers' independence exists; indeed, the opposite is true" because the "[d]efendants are using H[ouse] Res[olution] 38 to dissuade and punish Republican members of Congress from being able to speak or debate based on viewpoint").  As the plaintiffs correctly note, see id. at 11–12 (quoting Barker, 921 F.3d at 1128), the Circuit has described lawmakers' independence as one "essential" part of its decision in Consumers Union:

> [In Consumers Union, we] conclud[ed] that the [Periodical Correspondents'] Association's denial of the [plaintiff] organization's application "fell within the sphere of legislative activity" protected by the Clause[.  Consumers Union, 515 F.2d] at 1350 (internal quotation marks omitted).  Essential to that determination was the fact that Congress itself had developed the press gallery rules to protect legislators' independence: Congress designed the rules to ensure that the galleries would "be used by bona fide reporters who [would] not abuse the privilege of accreditation by importuning Members on behalf of private interests or causes."  Id. at 1347.  As [ ] explained in a later case, because the Association's denial of the organization's application involved "regulation of the very atmosphere in which lawmaking deliberations occur," the Speech or Debate Clause barred [the Circuit] from hearing the suit.  Walker[ ], 733 F.2d [at] 930[.]

<u>Barker</u>, 921 F.3d at 1128 (fifth alteration and some emphasis in original).[10]  However, in arguing that "no such considerations of lawmakers' independence exist" in this case, Pls.' Opp'n at 11–12, the plaintiffs fail to acknowledge that the Speech or Debate Clause serves to protect lawmakers' independence from <u>outside</u> influences—even from the judiciary.  <u>See, e.g.</u>, <u>Brewster</u>, 408 U.S. at 516 (noting that "Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch"); <u>Johnson</u>, 383 U.S. at 178 (stating that the judiciary should not "possess directly or indirectly, an overruling influence over the [Congress] in the administration of [its] respective powers" (quoting The Federalist No. 48 (James Madison))); <u>Gravel</u>, 408 U.S. at 616–17 (noting that "the central role of the Speech or Debate Clause[ is ]to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary").  As a challenge in federal court to the House's regulation of its Members' conduct during the legislative process, this case directly implicates the traditional concerns underlying the Speech or Debate Clause regarding the potential harms of judicial intrusion into legislative acts.  Moreover, although the plaintiffs argue that the only concerns about lawmakers' independence present here concern the defendants' use of House Resolution 38 "to dissuade and punish Republican members of Congress from being able to speak or debate

---

[10] The plaintiffs emphasize the second half of the Circuit's description of the essential parts of its decision in <u>Consumers Union</u>, namely, that the "press gallery rules [were developed] to protect legislators' independence[,]" <u>Barker</u>, 921 F.3d at 1128.  <u>See</u> Pls.' Opp'n at 11–12.  However, the plaintiffs overlook the first half of the Circuit's sentence on the subject—in full, the Circuit stated that "[e]ssential to [its] determination [in <u>Consumers Union</u>] was the fact that <u>Congress itself had developed the press gallery rules</u> to protect legislators' independence[,]" <u>Barker</u>, 921 F.3d at 1128 (emphasis added).  Therefore, the congressional intent "to protect legislators' independence[,]" <u>id.</u>, was only one of the "[e]ssential[,]" <u>id.</u>, components of the Circuit's decision in <u>Consumers Union</u>.  And here, similarly to the press gallery rules in <u>Consumers Union</u>, the House itself adopted both the rules endowing the Speaker with authority to "preserve order and decorum" in the House, H.R. Rule I, cl. 2, <u>see</u> H.R. Res. 8 (adopting the rules of the House for the 117th Congress), and House Resolution 38, which authorizes the defendants to impose and collect the fines challenged by the plaintiffs in this case, <u>see</u> H.R. Res. 38 § 4(a)(1).

24

based on viewpoint[,]"[11] Pls.' Opp'n at 12, neither <u>Barker</u>, <u>Consumers Union</u>, nor any other case cited by the plaintiffs recognizes concerns for an individual lawmaker's independence <u>from other lawmakers</u> as pertinent to the inquiry under the Speech or Debate Clause.

Fourth, the plaintiffs argue that "the deliberations, communications, and debate by Members and their staff are an entirely different function from carrying out a deed, which must be analyzed on its own merits[,]" and, therefore, even if the House is entitled to Speech or Debate Clause immunity for passing House Resolution 38, the defendants do not "'inherit' that immunity as implementing employees and Members." Pls.' Opp'n at 14. As support for their argument, the plaintiffs cite three cases in which the Supreme Court has distinguished between legislative acts by Members and non-legislative acts by legislative staff. <u>See</u> <u>id.</u> at 14–15 (citing <u>Kilbourn v. Thompson</u>, 103 U.S. 168, 200 (1880); <u>Dombrowski v. Eastland</u>, 387 U.S. 82, 84 (1967); <u>Powell v. McCormack</u>, 395 U.S. 486, 506 (1969)). However, in each of those cases, the conduct about which the Speech or Debate Clause was held not to apply was deemed not to be a legislative act. <u>See</u> <u>Kilbourn</u>, 103 U.S. at 200 (holding that the House employee who had arrested a private citizen pursuant to a House resolution was not entitled to Speech or Debate Clause immunity); <u>Dombrowski</u>, 387 U.S. at 85 (holding that the committee counsel who was charged with conspiring with state officials to carry out an illegal seizure of records that the committee sought for its own proceedings was not entitled to Speech or Debate Clause immunity); <u>Powell</u>, 395 U.S. at 506 (holding that the House employees who had enforced the

---

[11] Despite this argument in their opposition to the defendants' motion to dismiss, the plaintiffs make no allegation in their Complaint that wearing a mask or otherwise complying with the House's mask policy actually impedes their ability "to speak or debate based on viewpoint[,]" Pls.' Opp'n at 12. <u>See generally</u> Compl. Moreover, neither the House's mask policy announced on January 4, 2021, <u>see</u> 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore), nor the May 11, 2021, <u>see</u> 167 Cong. Rec. H2157 (daily ed. May 11, 2021) (announcement by the Speaker), or June 11, 2021, <u>see</u> 167 Cong. Rec. H2715 (daily ed. June 14, 2021) (announcement by the Speaker), amendments to the policy, support the proposition that complying with the policy infringed on a Member's ability to participate in the legislative process.

House's exclusion of an elected representative were not entitled to Speech or Debate Clause immunity).  As the Supreme Court noted in <u>Gravel</u>, Speech or Debate Clause "[i]mmunity was unavailable" in those cases "because [the congressional employees] engaged in illegal conduct that was not entitled to Speech or Debate Clause protection."  408 U.S. at 620.  Therefore, as noted in <u>McCarthy</u>, "[t]he 'key consideration . . . is the act presented for examination, not the actor[,]'" 5 F.4th at 39 (quoting <u>Walker</u>, 733 F.2d at 929), and the mere fact that the defendants are either legislative staff or not sued in their legislative capacity, <u>see</u> <u>supra</u> n.7, does not preclude them from immunity under the Speech or Debate Clause.

In sum, by delegating authority to the Speaker to "preserve order and decorum[,]" H.R. Rule I, cl. 2 (117th Cong.), and passing House Resolution 38 to compel Members to abide by the House's mask policy, <u>see</u> H.R. Res. 38 § 4(a)(1), the House is regulating "the very atmosphere in which lawmaking deliberations occur[,]" <u>Walker</u>, 733 F.2d at 930.  Accordingly, the Court concludes that all of the defendants' actions "implicate[] <u>Gravel</u>'s first category" because they "concern 'the direct business of passage or rejection of proposed legislation[,]'" <u>McCarthy</u>, 5 F.4th at 40 (quoting <u>Consumers Union</u>, 515 F.2d at 1351).[12]

## B.    The Second <u>Gravel</u> Category

The Court now turns to <u>Gravel</u>'s second category, namely, whether the defendants' actions fall within "other matters which the Constitution places within the jurisdiction of either House."  <u>Gravel</u>, 408 U.S. at 625.  The defendants argue that "the challenged acts are undeniably legislative" because "[t]he Constitution [ ] specifically grants to Congress the authority to adopt

---

[12] Although <u>Gravel</u> suggests that an action is a "legislative act" if it falls under either of the two categories recognized in that case, <u>see</u> 408 U.S. at 625 (noting that legislative acts "must be an integral part of the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation <u>or</u> with respect to other matters which the Constitution places within the jurisdiction of either House" (emphasis added)), the Court will consider both categories, as the Circuit did in <u>McCarthy</u>, <u>see</u> 5 F.4th at 40 (noting that, "while both this case and <u>Consumers Union</u> thus implicate <u>Gravel</u>'s second category, this case, unlike <u>Consumers Union</u>, also implicates <u>Gravel</u>'s first category").

its own rules and discipline its Members."  Defs.' Mem. at 13.  In response, the plaintiffs argue

that the defendants' actions are not "within the jurisdiction of [the] House[,]" <u>Gravel</u>, 408 U.S.

at 625, because "the House has ignored the constitutional restraints upon its rulemaking

authority[,]" Pls.' Opp'n at 5.  For the following reasons, the Court concludes that the

defendants' actions also constitute "other matters which the Constitution places within the

jurisdiction of either House[,]" <u>Gravel</u>, 408 U.S. at 625, because the House's authority to

establish the rules of the House and to discipline Members for non-compliance with those rules,

including through the actions challenged in this case, stems from the Constitution itself.

 Under Article I, Section 5, Clause 2 of the Constitution, the House has the authority to

"determine the Rules of its Proceedings" and "punish its Members for disorderly Behavior[.]"

U.S. Const. art. I, § 5, cl. 2.  This includes the authority to discipline Members for breaches of

decorum, <u>see</u> <u>Rangel</u>, 785 F.3d at 23 (noting that "a congressional disciplinary proceeding" is "a

'legislative' matter that 'the Constitution places within the jurisdiction of [the] House'" (quoting

<u>Gravel</u>, 408 U.S. at 625));[13] Jack Maskell, <u>Expulsion, Censure, Reprimand, and Fine in the</u>

<u>House of Representatives</u> 1–2, Cong. Rsch. Serv., RL31382 (2016) (hereinafter "Maskell")

---

[13] In their opposition, the plaintiffs seek to contrast the proceedings in <u>Rangel</u> with the defendants' actions in this
case, arguing that, in <u>Rangel</u>, "those staff members were doing their work in place of, and at the direction of,
Members themselves, and disciplinary proceedings are a function that Members historically have done
themselves[,]" whereas, here, "carrying out mask enforcement and payroll deductions are not remotely 'an integral
part of the deliberative and communicative processes by which Members participate in committee and House
proceedings,' nor do they constitute 'other matters which the Constitution places within the jurisdiction of the
House.'"  <u>Id.</u> (quoting <u>Gravel</u>, 408 U.S. at 625).  However, the plaintiffs offer no further explanation as to why
congressional discipline would not also include the issuance of fines.  <u>See generally</u> Pls.' Opp'n.  Moreover, in
<u>Rangel</u>, the Circuit noted that "a congressional disciplinary proceeding" was "a 'legislative' matter that 'the
Constitution places within the jurisdiction of [the] House[,]'" 785 F.3d at 23 (quoting <u>Gravel</u>, 408 U.S. at 625), and
cited as authority for this position Article I, Section 5, Clause 2, <u>id.</u> (citing U.S. Const. art. I, § 5, cl. 2).  Neither
<u>Rangel</u> nor Article I, Section 5, Clause 2, provides any support for the proposition that only disciplinary proceedings
that occur in front of committees are "place[d] within the jurisdiction of [the] House" within the meaning of
Article I, Section 5, Clause 2, <u>see</u> <u>Rangel</u>, 785 F.3d at 23; U.S. Const. art. I, § 5, cl. 2.  Accordingly, the Court
concludes that <u>Rangel</u> supports the conclusion that congressional discipline, broadly speaking, is "a 'legislative'
matter that 'the Constitution places within the jurisdiction of [the] House[.]'"  <u>See</u> <u>Rangel</u>, 785 F.3d at 23 (alteration
in original) (quoting <u>Gravel</u>, 408 U.S. at 625).

(noting that "the institution of the House has the right to discipline those who breach its privileges or decorum, or who damage its integrity or reputation"); and this authority extends to fining Members, see Kilbourn, 103 U.S. at 190 (noting "the power of punishment in either House by fine"); Lewis Deschler, Deschler's Precedents of the United States House of Representatives, H. Doc. 94-661, 94th Cong., 2d Sess., Ch. 12 § 17 (1979) (noting that "[a] fine may be levied by the House against a Member pursuant to its constitutional authority to punish its Members"); cf. Maskell, supra, at 14 (noting that the House "fined a Member in 1969 the sum of $25,000 to be repaid by automatically withdrawing a certain amount regularly from his pay, for various conduct offenses, including the misuse of official committee appropriations, payroll, and expenses" and fined a Member $10,000 as part of a reprimand "for misuse of official resources in compelling official congressional staff to work on political campaigns").  Here, as discussed above, see supra Section III.A, the defendants' actions fell within the scope of the scheme of disciplining Members for failing to comply with the "Rules of [the House's] Proceedings[,]" U.S. Const. art. I, § 5, cl. 2—the defendants fined the plaintiffs pursuant to House Resolution 38, which was passed by the House to enforce compliance with its mask policy, which was enacted pursuant to the Speaker's authority under House Rule I, clause 2, to "preserve order and decorum[,]" 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).  Accordingly, the defendants' actions fall squarely within the House's authority to establish its own rules and to discipline its Members for failure to comply with those rules.

Despite what the Court has just outlined, the plaintiffs argue that, although the "House certainly has the constitutional authority to enact rules for discipline and safety, it may not do so by violating the Constitution."  Pls.' Opp'n at 7 (citing United States v. Ballin, 144 U.S. 1, 5

Case 1:21-cv-02023-RBW   Document 47   Filed 03/09/22   Page 29 of 47

(1892));[14] see id. at 4–7.  Specifically, the plaintiffs identify three constitutional provisions that they contend "limit[] the [House's] rulemaking power" in this case, id.: (1) the Twenty-Seventh Amendment, see Compl. ¶¶ 49–54; (2) Article I, Sections 6 and 7, see id. §§ 60–67; and (3) the First Amendment, see id. §§ 68–75.[15]  For the following reasons, the Court concludes that none of these constitutional provisions limit the House's authority under Article I, Section 5, Clause 2, to adopt the mask policy and House Resolution 38.

1. **Whether the Twenty-Seventh Amendment Limits the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38**

The Court begins by assessing the plaintiffs' argument regarding the Twenty-Seventh Amendment.  The plaintiffs argue that "the implementation of punitive fines under H[ouse] Res[olution] 38 via salary deductions explicitly violates the prohibition against salary reductions of the [Twenty-Seventh] Amendment[.]"  Pls.' Opp'n at 5.  In response, the defendants argue that "House Resolution 38 does not vary Member 'compensation' within the meaning of the Twenty-Seventh Amendment" because it "affects Member salary only conditionally and indirectly based on the Member's own behavior" and "does not change [a] Member['s]

---

[14] As the defendants correctly note, see Defs.' Reply at 6, Ballin did not concern the Speech or Debate Clause—rather, it addressed when a challenge to internal congressional rules was a nonjusticiable political question, see Ballin, 144 U.S. at 5.  However, Ballin does address when a Court may review whether a congressional rule exceeds Congress's rulemaking and disciplinary authority under Article I, Section 5, Clause 2.  See id.  Accordingly, here, in order to consider whether the House's rulemaking and disciplinary authority under Article I, Section 5, Clause 2, places the defendants' actions "within the jurisdiction of [the] House[,]" Gravel, 408 U.S. at 625—and, therefore, within the scope of the Speech or Debate Clause—the Court must consider Ballin to the extent that the plaintiffs argue that the defendants have exceeded the House's rulemaking and disciplinary authority because the House's mask policy and House Resolution 38 violate other constitutional provisions.

[15] The plaintiffs also argue that the House lacks the authority under Article I, Section 5, Clause 2, to fine the plaintiffs for their failure to comply with the House's mask policy because the plaintiffs' failure to wear masks, albeit non-compliant, is not "disorderly[.]"  See Pls.' Opp'n at 31–35.  However, "in order to present a justiciable challenge to congressional procedural rules, [the p]laintiffs must identify a separate provision of the Constitution that limits the rulemaking power."  Common Cause v. Biden, 909 F. Supp. 2d 9, 28 (D.D.C. 2012) (emphasis added).  Because the plaintiffs' argument regarding the meaning of "disorderly" implicates the scope of Article I, Section 5, Clause 2, rather than a limit placed on the House's rulemaking authority by another constitutional provision, the plaintiffs' challenge under Article I, Section 5, Clause 2, is non-justiciable.  Cf. id. (concluding that Common Cause's challenge to a Senate rule was non-justiciable because the plaintiffs "identif[ied] no explicit constitutional restraints upon the [challenged] Senate[] [ ] [r]ule" at issue).

'compensation' for [his or her] 'services.'" Defs.' Reply at 8. For the following reasons, the Court concludes that the plaintiffs' compensation, as the term is used in the Twenty-Seventh Amendment, is not varied by the deduction of disciplinary fines from the plaintiffs' paychecks.

Pursuant to the Twenty-Seventh Amendment, "[n]o law varying the compensation for the services of the Senators and Representatives shall take effect, until an election of Representatives shall have intervened." U.S. Const. amend. XXVII. As demonstrated by the shared use of the phrase "compensation for [ ] services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend XXVII, the Twenty-Seventh Amendment modifies the Ascertainment Clause found in Article I, Section 6, Clause 1, which provides that "[t]he Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States[,]" U.S. Const. art. I, § 6, cl. 1. See Richard B. Bernstein, The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment, 61 Fordham L. Rev. 497, 502 (1992) (noting that "[t]he compensation amendment was intended to amend Article I, Section 6, Clause 1 of the United States Constitution"); see also id. at 526 (noting that the text of the proposed amendment put forth by the "committee named by the House [in 1789] to frame proposed amendments" edits the text of the Ascertainment Clause); House Committee Report (July 28, 1789), reprinted in Creating the Bill of Rights: The Documentary Record from the First Federal Congress 14–28 (Helen E. Veit et al., eds., 1991) (reflecting that an early draft of the amendment explicitly edited the language in Article I, Section 6).

As the parties both note, this amendment was originally "proposed in the First Congress on June 8, 1789[,] by Representative James Madison[,]" but was not ratified until May 7, 1992, when "Michigan became the thirty-eighth state to ratify [the] amendment[.]" Bernstein, supra, at 498. "According to Madison, and to all the ratifying states that stated their understanding, the

purpose of the amendment is to ensure that a congressional pay increase 'cannot be for the particular benefit of those who are concerned with determining the value of the service.'" Boehner v. Anderson, 30 F.3d 156, 159 (D.C. Cir. 1994) (quoting James Madison, Speech in the House of Representatives (June 8, 1789), in The Congressional Register, June 8, 1789, reprinted in Creating the Bill of Rights, supra, at 84; 138 Cong. Rec. S6836 (May 19, 1992) (documents supplementing remarks of Senator Byrd) (text of state resolutions concerning Madison amendment)).  Furthermore, as acknowledged by the plaintiffs, see Pls.' Opp'n at 19–25, the background of the Twenty-Seventh Amendment also reflects a concern regarding the ways in which candidates for the House of Commons of Great Britain "at first bid for their constituents' approval and support by promising to take lower wages, and later raised the stakes by pledging not to accept wages altogether[,]" Bernstein, supra, at 500–01; see id. at 526 (noting comments by House Members in 1789 regarding an initial draft of the amendment that "it might serve as a tool for designing men" to "reduce the wages very low, much lower than it was possible for any gentleman to serve without injury to his private affairs, in order to procure popularity at home" (quoting Debates in the House of Representatives (Aug. 14, 1789), in The Congressional Register, reprinted in Creating the Bill of Rights, supra)).

   To determine the meaning of the term "compensation" as used in the Twenty-Seventh Amendment, the Court first looks to definitions of the term at the time of the drafting of the Ascertainment Clause and what would become the Twenty-Seventh Amendment.[16] See United

---

[16] As noted above, the Twenty-Seventh Amendment and the Ascertainment Clause reference the same phrase— "compensation for [ ] services[,]" U.S. Const. art. I, § 6, cl. 2; U.S. Const. amend. XXVII—and the Twenty-Seventh Amendment modifies the Ascertainment Clause, see Bernstein, supra, at 502 (noting that "[t]he compensation amendment was intended to amend Article I, Section 6, Clause 1 of the United States Constitution"); see also id. at 526 (noting that the text of the proposed amendment put forth by the "committee named by the House [in 1789] to frame proposed amendments" edits the text of the Ascertainment Clause); House Committee Report (July 28, 1789), reprinted in Creating the Bill of Rights, supra, at 14–28 (reflecting that an early draft of the amendment explicitly edited the language in Article I, Section 6).  Therefore, the Court concludes that the meaning of the word
(continued . . .)

States v. Sprague, 282 U.S. 716, 731 (1931) ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition.").  These definitions demonstrate that the meaning of "compensation" from the time of the drafting of the Ascertainment Clause and what would become the Twenty-Seventh Amendment is clear: the provision of "something equivalent[.]" Samuel Johnson, Dictionary of the English Language 181 (6th ed. 1785), https://heinonline.org/HOL/Index?index=cow/denlwwd&collection=lbr; see also id. ("Recompence; something equivalent; amends."); A New General English Dictionary 169 (14th ed. 1771), https://heinonline.org/HOL/Page?handle=hein.lbr/ngengd0001&id=1&collection=lbr&index=ldic ("[T]he satisfying or making returns for any thing done, or favours received."); 1 John Ash, The New and Complete Dictionary of the English Language 111 (2d ed. 1795), https://heinonline.org/HOL/Page?collection=lbr&handle=hein.lbr/ncdctel0001&id=200&men_tab=srchresults ("A recompence, amends.").  Therefore, by using the phrase "compensation for the[ir] services[,]" the Ascertainment Clause and the Twenty-Seventh Amendment were referencing the remuneration that Members receive in return for their "services" as Members, see U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, which, pursuant to the Ascertainment Clause, is "ascertained by Law[] and paid out of the Treasury of the United States[,]" U.S. Const. art. I, § 6, cl. 1.

Furthermore, the history of congressional salaries demonstrates that the amount of the compensation referred to in the Ascertainment Clause and the Twenty-Seventh Amendment has

_____

(. . . continued)

"compensation" is the same in both the Twenty-Seventh Amendment and the Ascertainment Clause, and will analyze the amendment and the clause collectively.

changed over time through the passage of legislation.  Initially, "[b]itter argument in the summer

and fall of 1789 resulted in a statute establishing that Senators and Representatives were to be

paid six dollars per day for actual attendance at legislative sessions, as well as six dollars per day

for time spent traveling to and from the seat of the federal government[,]" Bernstein, supra,

at 533 (citing 6 Documentary History of the First Federal Congress 1789–1791, at 1833–45

(Charlene Bangs Bickford & Helen E. Veit, eds., 1986)); see also 1 Stat. 70–71 (Sept. 22, 1789),

and it was "[o]nly in 1855" when "Congress [was] emboldened to alter the basis of its

compensation to an annual salary, which it then held in place for ten years[,]" id. at 533–34; see

11 Stat. 48 (Aug. 16, 1856).  See generally Congressional Quarterly's Guide to Congress at 635–

49 (4th ed. 1991); see also Cong. Rsch. Serv., RL 97-1011, Salaries of Members of Congress:

Recent Actions and Historical Tables tbl. 1 (updated Jan. 25, 2022) ("Salaries of Members of

Congress") (reflecting congressional pay since 1789).  Since the passage of the Ethics Reform

Act of 1989, congressional pay has included an annual cost-of-living adjustment ("COLA"), see

2 U.S.C. § 4501(2)(A), which "employs a formula based on changes in private sector wages and

salaries as measured by the Employment Cost Index" and which "automatically goes into effect

unless" (1) "Congress statutorily prohibits the adjustment[,]" (2) "Congress statutorily revises the

adjustment[,]" or "[t]he annual base pay adjustment for [General Schedule] employees is

established at a rate less than the scheduled adjustment for Members, in which case Members

would be paid the lower rate[,]" Salaries of Members of Congress, supra, at 2.  See Boehner,

30 F.3d at 162 (holding that "the COLA provision of the Ethics Reform Act of 1989" does not

violate the Twenty-Seventh Amendment" because it did not go into effect until "after [an]

election" following the passage of the Act "and the seating of the new Congress").  Since 2009,

Congress has denied itself the annual adjustment, see Salaries of Members of Congress, supra, at 2, and, thus, a Representative's annual salary has remained at $174,000 per year, see id. at 19.

Therefore, the "compensation" received by Members in return for their "services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is the compensation set by the most recent applicable statute prescribing congressional pay, thus comporting with the Ascertainment Clause's requirement that such compensation be "ascertained by [l]aw[,]" U.S. Const. art. I, § 6, cl. 1.[17]  And, consequently, a Member's current "compensation" is the $174,000 annual salary that was deemed to be the "something equivalent" to the congressional service provided by Members, see Dictionary of the English Language, supra, at 181, as set by the most recent compensation-setting statute, the Ethics Reform Act of 1989.

Having determined the constitutional meaning of what constitutes "compensation[,]" the Court concludes that this "compensation[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is not altered within the meaning of the Twenty-Seventh Amendment by the deduction of fines from the plaintiffs' paychecks.  House Resolution 38 does not purport to modify the compensation designated in the Ethics Reform Act of 1989, see generally H.R. Res. 38, and, as the plaintiffs themselves acknowledge, "the fines [do] not change th[eir] underlying salary level of $174,000 per annum[,]" Pls.' Opp'n at 30.  Rather, the fines are independent "deduct[ions] . . . from the net salary otherwise due the Member[,]" H.R. Rule II, cl. 4(d)(1), triggered by the plaintiffs' non-compliance with the House's Rules and policies regarding decorum.

---

[17] The plaintiffs acknowledge that the Ascertainment Clause requires compensation to be set by statute.  See Pls.' Opp'n at 35 n.28 (arguing that the term "Law," in Article I, Section 6 . . . refers to enactments of bills by Congress that have been presented to the President").

The plaintiffs muster only conclusory arguments to the contrary, asserting that, "[w]hile the fines may not change the underlying salary level of $174,000 per annum, it defies logic (and math) to suggest that deducting money does not vary, i.e., reduce, those Members' actual compensation for their services." Pls.' Opp'n at 30 (underline added).  As an initial matter, the Court notes that, although the plaintiffs refer to their "actual compensation[,]" id., the term "actual" is not found in either the Twenty-Seventh Amendment or the Ascertainment Clause, see U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, and accordingly has no relevance to the Court's analysis of the amendment's language, see Sprague, 282 U.S. at 731 (noting that, "where the intention is clear[,] there is no room for construction and no excuse for interpolation or addition").  Moreover, the plaintiffs offer no support for the proposition that the "compensation" referred to in the Twenty-Seventh Amendment refers to the amount they receive in their paychecks after any deductions from their gross salary, rather than to the gross salary set by law.  See generally id.  Rather, contrary to the plaintiffs' argument, as discussed above, the "compensation" received by the plaintiffs in return for their "services[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, is their salary of $174,000, as set by the most recent compensation-setting statute.  And, as the plaintiffs acknowledge, neither House Resolution 38 nor the defendants' actions alter this amount.  See Pls.' Opp'n at 30 ("[T]he fines [do] not change th[e plaintiffs'] underlying salary level of $174,000 per annum[.]").  Moreover, in light of the plaintiffs' vague, generalized, and unsupported arguments, see, e.g., Pls.' Opp'n at 30 (arguing based on unspecified "logic[] and math[]"); id. ("Without question the fine reduces the Member's salary before he [or she] ever receives it."), the Court is unconvinced that the plaintiffs' "compensation[,]" U.S. Const. art. I, § 6, cl. 1; U.S. Const. amend. XXVII, was altered by the mere fact that the mechanism chosen by the House to collect these fines—"deduct[ions]

. . . from the net salary otherwise due the Member[,]" H.R. Rule II, cl. 4(d)(1)—occurred before

the plaintiffs received their paychecks.[18]

Accordingly, the Court concludes that the deduction of fines from the plaintiffs'

paychecks pursuant to House Resolution 38 does not violate the Twenty-Seventh Amendment,

and, therefore, the Twenty-Seventh Amendment does not limit the House's authority to adopt the

mask policy or House Resolution 38 pursuant to its rulemaking and disciplinary authority under

Article I, Section 5, Clause 2.[19]

### 2. Whether Article I, Sections 6 and 7 Limit the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38

Second, the Court turns to the plaintiffs' argument regarding Article I, Sections 6 and 7.

As noted previously, the Ascertainment Clause in Article I, Section 6, Clause 1, states that "[t]he

Senators and Representatives shall receive a Compensation for their Services, to be ascertained

by Law, and paid out of the Treasury of the United States."  U.S. Const. art. I, § 6, cl. 1.

Article I, Section 7, Clause 2 sets forth the process of bicameralism and presentment, requiring

that "[e]very bill which shall have passed the House of Representatives and the Senate, shall,

before it become a Law, be presented to the President of the United States[.]"  U.S. Const. art. I,

§ 7, cl. 2.  Relying on these two provisions as support for their position, the plaintiffs assert that

"the implementation of H[ouse] Res[olution] 38 abrogates the protections of Article I,

[Sections] 6 and 7[] because measures related to Members' compensation must be set as law,

---

[18] The plaintiffs deem the conclusion that the deduction of fines from their paychecks does not vary their "compensation" within the meaning of the Twenty-Seventh Amendment to be "merely word play, as reducing the bottom line on a paycheck is a reduction in compensation."  Pls.' Opp'n at 36.  However, again, the plaintiffs offer no support for the proposition that "compensation[,]" as it is used in the Ascertainment Clause and the Twenty-Seventh Amendment, refers to the amount that they receive in their paychecks, as opposed to the congressional salary established by law.  See Pls.' Opp'n at 36.

[19] The parties also dispute whether House Resolution 38 is a "law" within the meaning of the Twenty-Seventh Amendment.  See Defs.' Mem. at 17–20; Pls.' Opp'n at 25–29.  However, in light of the Court's conclusion that House Resolution 38 does not vary the plaintiffs' compensation, see supra Section III.B.1, the Court need not determine whether House Resolution 38 is a "law" within the scope of the Twenty-Seventh Amendment.

which requires passage by both chambers of Congress and presentment to the President[.]" Pls.'

Opp'n at 5.

In light of the Court's prior conclusion that neither the House's mask policy nor House

Resolution 38 affects the plaintiffs' "compensation for their services" within the purview of the

Twenty-Seventh Amendment and the Ascertainment Clause, see supra Section III.B.1, it must

similarly conclude that the Ascertainment Clause's requirement that "compensation" must "be

ascertained by law[,]" U.S. Const., art. I, § 6, pursuant to the procedures in Article I, Section 7,

does not apply. Accordingly, the Court concludes that the deduction of fines from the plaintiffs'

salaries pursuant to House Resolution 38 does not violate Article I, Sections 6 and 7, and neither

of those provisions limit the House's authority to adopt the mask policy and House

Resolution 38 under its rulemaking and disciplinary authority.

### 3. Whether the First Amendment Limits the House's Authority under Article I, Section 5, Clause 2 to Adopt the Mask Policy and House Resolution 38.

Third and finally, the plaintiffs argue that the House's mask policy and House

Resolution 38 "punish[ M]embers for contrary viewpoint-based symbolic speech, in

contravention of the First Amendment."[20] Pls.' Opp'n at 5. In response, the defendants argue

that the House's mask policy and House Resolution 38 do not violate the First Amendment

---

[20] Although the plaintiffs also make reference to an argument that the House's mask policy and House Resolution 38 violate the First Amendment as "compelled viewpoint-based symbolic speech[,]" Pls.' Opp'n at 11, they do not actually present any such argument in the two-and-a-half-page sub-section of their opposition under that section heading, see id. from 42–44 (the section titled "Compelled speech (the requirement to be masked)"). Instead, that sub-section copies word-for-word—and without any citation—a discussion of the compelled speech doctrine in the United States Court of Appeals for the Tenth Circuit's decision in Cressman v. Thompson, 719 F.3d 1139 (10th Cir. 2013). Compare Pls.' Opp'n at 42–44, with Cressman, 719 F.3d at 1151–52. As the defendants correctly note in response, the lack of argument by the plaintiffs is "fatal to [the p]laintiffs' claim[,]" Defs.' Reply at 19, because the Court is without any basis on which to consider whether the House's mask policy and House Resolution 38 constitute compelled speech. Moreover, "an argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded[.]" Rosenblatt v. Fenty, 734 F. Supp. 2d 21, 22 (D.D.C. 2010). Therefore, to the extent that the plaintiffs present a claim that the House's mask policy and House Resolution 38 violate the First Amendment by compelling the wearing of masks in the House Chamber, the Court will deem the claim conceded and grant the defendants' motion to dismiss that claim for that reason.

because the interest underlying the policy is "important" and "unrelated to the suppression of expression[,]" and "the incidental restriction on [the plaintiffs'] alleged First Amendment freedoms is no greater than is essential to the furtherance of [the stated] interest[s]."  Defs.' Mot. at 28 (internal quotation marks omitted).  For the following reasons, the Court agrees with the defendants.

Although "[t]he First Amendment literally forbids the abridgment only of 'speech[,]'" courts "have long recognized that its protection does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404 (1989).  Accordingly, "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[],'" provided that (1) "'[a]n intent to convey a particularized message was present'" and (2) "'the likelihood was great that the message would be understood by those who viewed it."  Id. (quoting Spence v. Washington, 418 U.S. 405, 409 (1974)).  However, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word[,]" although "[i]t may not, however, proscribe particular conduct because it has expressive elements."  Id. at 406 (emphasis in original).  If a law is "directed at the communicative nature of [the] conduct[, it] must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires."  Id. (internal quotation marks omitted) (emphasis in original).  However, in "those cases in which 'the governmental interest is unrelated to the suppression of free expression[,]" id. at 407 (quoting United States v. O'Brien, 391 U.S. 367, 377 (1968)), "'a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms,'" Nicopure Labs, LLC v. Food & Drug Admin., 266 F. Supp. 3d 360, 410 (D.D.C. 2017) (quoting O'Brien, 391 U.S. at 376), so long as the "regulation [ ] leave[s] open ample

alternative channels for communication[,]" id. (citing <u>Clark v. Cmty. for Creative Non-Violence</u>,

468 U.S. 288, 293 (1984)).[21]

Here, it is undisputed that the plaintiffs allege "[a]n intent to convey [several]

particularized message[s,]" <u>id.</u>, in not wearing masks in the House Chamber—specifically, that

> mask[-]wearing is not scientifically based, [ ] mask[-]wearing is not necessary for
> the vaccinated or naturally immune, [ ] mask[-]wearing is merely political theater,
> [ ] one's bodily integrity should be free from government control, [ ] individuals
> should have the liberty to choose what they wear on their face, . . . individuals
> should be free to make their own medical decisions[, and] . . . the use of face
> coverings has no appreciable effect on slowing or halting the spread of
> COVID-19.

Compl. ¶ 27.  <u>See</u> Defs.' Mot. at 28 (conceding that the "[p]laintiffs allege an intent to convey a

particularized message" (internal quotation marks omitted)).  However, even assuming that "the

likelihood was great that the message [that the plaintiffs contend they intended to convey by their

actions] would be understood by those who viewed it[,]" <u>Johnson</u>, 491 U.S. at 404, which would

entitle the plaintiffs' conduct to First Amendment protection, <u>see id.</u>, the Court cannot conclude

for several reasons that the House's mask policy or House Resolution 38 violate the First

Amendment.

Under <u>United States v. O'Brien</u>,

---

[21] The plaintiffs also present a two-sentence argument that, "when it comes to the symbolic speech at issue [here], one viewpoint was favored over another" and "viewpoint discrimination is <u>ipso facto</u> unconstitutional in" the House Chamber because it is "a limited public forum[,]" Pls.' Opp'n at 45 (underline in original).  Even assuming that the plaintiffs are correct that the adoption of a mask policy pursuant to scientific guidance to combat the spread of COVID-19 constitutes the "favor[ing]" of "one viewpoint . . . over another[,]" <u>id.</u>, the single case cited by the plaintiffs, <u>Good News Club v. Milford Central School</u>, addressed the regulation of pure speech, rather than expressive conduct, <u>see</u> 533 U.S. 98, 104 (2001) (noting that the prohibited actions were "religious instruction and Bible study").  As noted above, <u>see supra</u> Section III.B.3, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word[,]" <u>Johnson</u>, 491 U.S. at 406, as reflected by the distinct inquiry under <u>Johnson</u> and <u>O'Brien</u> for expressive conduct where the challenged restriction is unrelated to the suppression of expression.  Because the plaintiffs have not provided any support for the proposition that they have plausibly alleged a claim of viewpoint discrimination, the Court is without any basis on which to consider the plaintiffs' argument.  Accordingly, the Court will grant the defendants' motion to dismiss the plaintiffs' viewpoint discrimination claim.  <u>See</u> <u>Cummings ex rel. J.C. v. Woodson Senior High Sch.</u>, 563 F. Supp. 2d 256, 259 (D.D.C. 2008) (dismissing Cummings's "IDEA claims" because "[t]he brief she filed [ ] is filled with irrelevant legal principles and citations on [unrelated] topics").

> a government regulation is sufficiently justified if [(1)] it is within the constitutional power of the [g]overnment; [(2)] if the governmental interest is unrelated to the suppression of free expression; and [(3)] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Id. at 377.  Regarding the first O'Brien factor, as noted above, see supra Section III.B, the House has the authority under Article I, Section 5, Clause 2, to adopt rules regarding the legislative process and to discipline Members for non-compliance.[22]  See U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings" and "punish its Members for disorderly Behavior").  Therefore, O'Brien's first factor is satisfied.

Regarding the second O'Brien factor, the reasons underlying both the House's mask policy and House Resolution 38 are "unrelated to the suppression[,]" O'Brien, 391 U.S. at 377, of the messages the plaintiffs claim they intended to convey by refusing to wear masks.  The House's mask policy expressly references its underlying reasoning, namely, the Speaker's "responsibility to ensure the protection of Member and staff safety and health during proceedings[,]" which "is of paramount importance, particularly in the midst of a pandemic."

---

[22] The Court notes the circularity of the first inquiry under O'Brien as applied to this case.  In this section of this Memorandum Opinion, the Court is addressing whether the House does, in fact, have the authority under Article I, Section 5, Clause 2, to adopt the mask policy and House Resolution 38, see Section III.B.1–3, and under Ballin, the Court may only do so by determining whether other constitutional provisions limit Article I, Section 5, Clause 2.  Furthermore, because the Court has already determined that the mask policy and House Resolution 38 do not violate either the Twenty-Seventh Amendment or Article I, Sections 6 and 7, see supra Section III.B.1–2, the only remaining issue regarding whether the mask policy and House Resolution 38 are within the House's rulemaking authority is whether they violate the First Amendment, i.e., through this very analysis under O'Brien.

If the House's mask policy and House Resolution 38 satisfy the O'Brien factors, then there is no constitutional violation and the House has acted within its rulemaking authority—which, in turn, would satisfy the first O'Brien factor.  See O'Brien, 391 U.S. at 377 (listing the first factor as whether the regulation "is within the constitutional power of the [g]overnment").  Conversely, if the policy and the resolution do not satisfy the O'Brien factors, then the House has not acted within its rulemaking authority (because the First Amendment would prevent the House from enacting its mask policy and House Resolution 38 under its rulemaking and disciplinary authority), and the first O'Brien factor would not be satisfied.  Therefore, because the remaining O'Brien factors are met, and, broadly speaking, the House has the authority under Article I, Section 5, Clause 2, to enact rules regarding the legislative process and to discipline its own members, see U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings" and "punish its Members for disorderly Behaviour"), the Court concludes that the first requirement of the O'Brien inquiry is satisfied in this case.

167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).

Similarly, although House Resolution 38 does not expressly set forth the reasons for its adoption,

it applies only "[d]uring a covered period[,]" H.R. Res. 38 § 4(a), as designated by House

Resolutions 8 and 965, i.e., during "a public health emergency due to a novel coronavirus[,]"

H.R. Res. 965 § 1(a).  Thus, the conduct of not wearing a mask in the House Chamber is

"singl[ed] out . . . for proscription[,]" Johnson, 491 U.S. at 406 (internal quotation marks

omitted), not for the purpose of restricting the plaintiffs' intended messages, but rather because

of "the importance of [requiring] safe practices" "in the midst of a pandemic[,]" 167 Cong. Rec.

H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore).  Accordingly, the

Court concludes that the House's mask policy and House Resolution 38 were implemented in

order to help prevent the spread of COVID-19, not "because [the failure to wear a mask in the

House Chamber may] ha[ve] expressive elements[,]" Johnson, 491 U.S. at 406 (emphasis in

original), and O'Brien's second factor is satisfied.

      Finally, concerning the third O'Brien factor, the Court concludes that "the incidental

restriction" on the plaintiffs' "alleged First Amendment freedoms is no greater than is essential

to the furtherance of [the House's] interest[,]" id., in preventing the spread of the COVID-19

virus amongst Members of the House and their staff.  Since March 2020, the United States has

been grappling with the devastating effects of the COVID-19 pandemic, including an ever-rising

death toll from the virus.  See, e.g., Ctrs. for Disease Control & Prevention ("CDC"), COVID

Data Tracker: Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC,

by State/Territory, https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths (last visited

March 9, 2022)  ("CDC COVID-19 Death Tracker") (reflecting the number of COVID-19

related cases and deaths in the United States since January 23, 2020);[23] <u>Roman Cath. Diocese of Brooklyn v. Cuomo</u>, 141 S. Ct. 63, 73 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief) ("[T]he COVID-19 pandemic remains extraordinarily serious and deadly."); <u>Agua Caliente Band of Cahuilla Indians v. Mnuchin</u>, No. 20-01136, 2020 WL 2331774, at *1 (D.D.C. May 11, 2020) (noting "the devastating impacts of the COVID-19 pandemic").  Although "[m]ost people with COVID-19 have mild symptoms, [ ] some people become severely ill."  CDC, Basics of COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html ("CDC COVID-19 Basics Factsheet") (last visited March 7, 2022).  This includes "[o]lder adults and people who have certain underlying medical conditions[,]" who "are at increased risk of severe illness from COVID-19[,]" but also people "with minor or no symptoms [who] suffer from post-COVID conditions[,] or [so-called] 'long COVID.'"  <u>Id.</u>  On January 4, 2021, when the Speaker announced the House's mask policy, the CDC reported the deaths of 2,092 people on that day in the United States due to COVID-19, which brought the nation's cumulative total of deaths from the virus to 370,527.  <u>See</u> CDC COVID-19 Death Tracker.  By January 12, 2021, when the House adopted House Resolution 38, the number had risen to 3,602 deaths reported on that day and 397,752 total deaths across the country.  <u>See id.</u>  By May 18, 2021, and May 19, 2021, when the plaintiffs appeared in the House Chamber without masks, although the nation's daily death rate had decreased substantially to 604 and 607, respectively, the total number of deaths in the country had increased to 588,764.  <u>See id.</u>

---

[23] As a "government document[] available from [a] reliable source[,]" <u>Democracy Forward Found. v. White House Off. of Am. Innovation</u>, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019), the Court may take judicial notice of this report by the CDC.  Moreover, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  <u>Scolaro</u>, 104 F. Supp. 2d at 22.

Additionally, as acknowledged by articles cited by the plaintiffs in their Complaint, the virus is "a highly infectious disease[,]" Costa v. Bazron, 456 F. Supp. 3d 126, 129 (D.D.C. 2020). See Compl. at 10 n.12 (collecting articles); Amanda D'Ambrosio, Droplets vs Aerosols: What's More Important in COVID-19 Spread?, MedPage Today (May 13, 2021), https://www.medpagetoday.com/specialreports/exclusives/92564 ("D'Ambrosio") (noting that "inhalation of aerosols—which are tiny, lightweight viral particles that can float and linger in the air for extended periods of time—is one way [in which] COVID-19 spreads" and, "[e]ven when an infectious person is more than [six] feet away, aerosols have the ability to travel and infect others"); see also CDC COVID-19 Basics Factsheet, supra (noting that COVID-19 "is very contagious and has quickly spread around the world").

Contrary to the plaintiffs' assertion regarding the existence of "recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27,[24] the consensus within the scientific community is clear that

---

[24] In their Complaint, the plaintiffs assert that their intended messages are based on "well-founded beliefs[.]" Compl. ¶ 27. To support their assertion that their "symbolic speech was also an effort to highlight recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" id., they cite three articles which state that (1) "[p]eople release respiratory fluids during exhalation . . . in the form of droplets" that "carry virus and transmit infection" and form "aerosol particles . . . when [ ] fine droplets rapidly dry[,]" id. at 10 n.12 (quoting CDC, SARS-CoV-2 Transmission (updated May 7, 2021), https://www.cdc.gov/ coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html#:~:text=People%20release% 20respiratory%20fluids%20during,across%20a%20spectrum%20of%20sizes.&text=These%20droplets%20carry%2 0virus%20and,rapidly%2C%20within%20seconds%20to%20minutes ("CDC COVID-19 Transmission Factsheet")); (2) "new guidance acknowledges that inhalation of aerosols . . . is one[ ]way [in which] COVID-19 spreads[,]" id. (quoting D'Ambrosio, supra); and (3) "[a]lthough surgical mask[s] [ ] may be adequate to remove bacteria exhaled or expelled by health[-]care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens to which these health[-]care workers are potentially exposed[,]" id. (quoting Chih-Chieh Chen & Klaus Willeke, Aerosol Penetration Through Surgical Masks, 20 Am. J. Infect. Control 177–84 (1992), https://www.ajicjournal.org/article/S0196-6553(05)80143-9/pdf).

It is unclear whether the plaintiffs have accurately consumed the content of the three articles they cite to support their assertion of the existence of "recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27. See id. at 10 n.12. The CDC article, which states that COVID-19 is spread through droplets, including aerosol particles, specifically states that "the available evidence continues to demonstrate that existing recommendations to prevent [COVID-19] transmission remain effective[,]" including, inter alia, "community use of well-fitting masks (e.g., barrier face coverings,

(continued . . .)

43

masks—and, in particular, well-fitting, protective masks—are effective in slowing the spread of

the COVID-19 virus, as demonstrated by the very articles cited by the plaintiffs in their

Complaint, see id. at 10 n.12 (citing articles); CDC, SARS-CoV-2 Transmission (updated May 7,

2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-

transmission.html#:~:text=People%20release%

20respiratory%20fluids%20during,across%20a%20spectrum%20of%20sizes.&text=These%20dr

oplets%20carry%20virus%20and,rapidly%2C%20within%20seconds%20to%20minutes ("CDC

COVID-19 Transmission Factsheet") (stating that "the available evidence continues to

demonstrate that existing recommendations to prevent [COVID-19] transmission remain

effective[,]" including, inter alia, "community use of well-fitting masks (e.g., barrier face

coverings, procedure/surgical masks" (underline added)); D'Ambrosio, supra (noting a statement

by "Monica Gandhi, MD, MPH, an infectious disease expert at the University of California San

Francisco" that "wearing a tight-fitting mask in poorly ventilated spaces, as well as spending

time outdoors—where ventilation is about as good as it gets—have proven to be critical infection

prevention approaches").  For these reasons, the Court concludes that any "incidental restriction

---

(. . . continued)
procedure/surgical masks)[.]"  CDC COVID-19 Transmission Factsheet, supra (underline added).  Similarly, the MedPage Today article contains a statement by "Monica Gandhi, MD, MPH, an infectious disease expert at the University of California San Francisco" that "wearing a tight-fitting mask in poorly ventilated spaces, as well as spending time outdoors—where ventilation is about as good as it gets—have proven to be critical infection prevention approaches."  D'Ambrosio, supra.  Finally, although Chen and Willeke do conclude that "surgical mask[s] . . . may not be sufficient to remove the submicrometer-sized aerosols containing pathogens to which [ ] health[-]care workers are potentially exposed[,]" Chen, supra, at 177, they address only one type of mask—surgical masks—and do not specifically refer to COVID-19 or coronaviruses, see generally id.  Furthermore, the Court questions whether the Chen and Willeke article, which was published in 1992, see id., could plausibly be called a "recent scientific finding[,]" Compl. ¶ 27.  Finally, as noted by the CDC, healthcare personnel have been using respirators—not surgical masks—during the COVID-19 pandemic, see CDC, Summary of N95 Respirator Strategies (updated Apr. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/checklist-n95-strategy.html, which are a more protective type of mask, see CDC, Types of Masks and Respirators (updated Jan. 28, 2022), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html.  Accordingly, the plaintiffs offer no credible support for their allegation that there are "recent scientific findings that the use of face coverings has no appreciable effect on slowing or halting the spread of COVID-19[,]" Compl. ¶ 27.

on [the plaintiffs'] alleged First Amendment freedoms" by requiring them to wear masks while

in the House Chamber and imposing fines for their failure to do so "is no greater than is essential

to the furtherance of[,]" O'Brien, 391 U.S. at 377, the government's interest in limiting the

spread of the COVID-19 virus in the House Chamber.  As the defendants correctly note, see

Defs.' Mem. at 29, the plaintiffs had myriad means of expressing their stated messages,

including wearing masks or other clothing containing the messages they wanted to convey, or

making speeches from the House Chamber or elsewhere on the subject.  Cf. Terry v. Reno, 101

F.3d 1412, 1413, 1420 (D.C. Cir. 1996) (concluding that the Freedom of Access to Clinic

Entrances Act, which "prohibit[ed] the use or threat of force or physical obstruction against a

person seeking to obtain or provide reproductive health services . . . survives O'Brien's third

inquiry" in part because it "leaves open ample alternative means for communication" since

"protestors may still stand outside reproductive health facilities and express their anti-abortion

message").  On the other hand, to permit the plaintiffs not to wear masks would defeat the very

purpose of the mask policy, i.e., limiting the spread of the virus to other House Members and

staff.

　　　　In response, the plaintiffs argue that "[t]he protest in this case was not actually disruptive

to any proceedings (any more than wearing white to a State of the Union [ ] to protest the

President), and therefore it was protected[.]"  Pls.' Opp'n at 42 (emphasis in original).  The

plaintiffs analogize this case to Tinker v. Des Moines Independent Community School District,

in which the Supreme Court held that a school violated the First Amendment when it prohibited

students from wearing black armbands to protest the Vietnam War when "the record [did] not

demonstrate any facts which might reasonably have led school authorities to forecast substantial

disruption of or material interference with school activities[,]" 393 U.S. 503, 514 (1969).  Tinker

provides no support for the plaintiffs' position.  Not wearing masks—and, thereby, to use the language quoted by the plaintiffs in their Complaint, "releas[ing] respiratory fluids during exhalation" that "carry virus and transmit infection" without any sort of preventative mechanism in the middle of a deadly pandemic caused by a highly contagious virus, Compl. at 10 n.12 (quoting CDC COVID-19 Transmission Factsheet, supra)—is not comparable to wearing an armband on top of one's clothing.  However, even assuming that the plaintiffs are correct that not wearing masks is not "actually disruptive[,]" Pls.' Opp'n at 42 (emphasis in original), in this case, any relative disruption caused by the plaintiffs' conduct is not pertinent to whether the mask policy and House Resolution 38 satisfy all three requirements under O'Brien, see Johnson at 377.  Although, as the plaintiffs correctly state, see Pls.' Opp'n at 42, Johnson noted that "no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the [American] flag[,]" 491 U.S. at 408, the Supreme Court considered the existence of a disturbance in its First Amendment analysis in Johnson because the government in that case asserted an "interest in preventing breaches of the peace[,]" id. at 407.  The House has not asserted a similar interest here, see generally Defs.' Mem.; Defs.' Reply; 167 Cong. Rec. H40–41 (daily ed. Jan. 4, 2021) (announcement by the Speaker Pro Tempore); H.R. Res. 38, and therefore the relative level of disruption caused by the plaintiffs' alleged expressive conduct is not pertinent to the Court's analysis.

The plaintiffs present no other response to the defendants' arguments that the purpose of the House's mask policy and House Resolution 38 is "unrelated to the suppression of expression[,]" Defs.' Mot. at 28 (quoting Johnson, 491 U.S. at 407), and that the policy and the Resolution "easily meet[] all [of the] O'Brien requirements[,]" id. at 29.  See generally Pls.' Opp'n at 36–42 (presenting the plaintiffs' symbolic speech argument).  Accordingly, and for the

foregoing reasons, the Court concludes that any "incidental impact on speech caused by the conduct limitations of" the House's mask policy and House Resolution 38 "is outweighed by the strong governmental interests behind the" policies, Palestine Info. Off. v. Shultz, 853 F.2d 932, 934 (D.C. Cir. 1988), and therefore, the policy and House Resolution 38 do not violate the First Amendment.

Therefore, neither the Twenty-Seventh Amendment; Article I, Sections 6 and 7; nor the First Amendment present a limit to the House's authority under Article I, Section 5, Clause 2, to adopt its mask policy and House Resolution 38.[25]  Thus, and for the reasons stated above, see supra Section III.B, the Court concludes that the House's mask policy and House Resolution 38 also fall under Gravel's second category because they constitute "other matters which the Constitution places within the jurisdiction of either House[,]" Gravel, 408 U.S. at 625.

In summary, because the defendants' actions fall under both Gravel categories, the defendants are entitled to the protection of the Speech or Debate Clause.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion and dismiss the plaintiffs' Complaint.

**SO ORDERED** this 9th day of March, 2022.[26]

REGGIE B. WALTON
United States District Judge

---

[25] Because the Court concludes that the House has not "ignore[d] constitutional restraints or violate[d] fundamental rights," Ballin, 144 U.S. at 5, it need not proceed to the next step of the inquiry under Ballin, namely whether there is "a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained[,]" id.

[26] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.